IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:

FIDELITY BROKERAGE SERVICES LLC, a limited liability company,

     Plaintiff,

v.

ERIC VEVE, an individual,

     Defendant.

---

## COMPLAINT

Plaintiff Fidelity Brokerage Services LLC ("Fidelity"), by its undersigned counsel, hereby brings this action for injunctive relief against Defendant Eric Veve ("Veve") for misappropriation of trade secrets, breach of contract, breach of the duty of loyalty and violation of the Colorado Consumer Protection Act.

### NATURE OF THE CASE

1.    Through this action, Fidelity seeks injunctive and other relief to stop Veve from unlawfully misappropriating Fidelity's trade secret customer information, using that information to solicit Fidelity's customers and misleading Fidelity's customers by representing that he is still affiliated with Fidelity.  Veve is a former Fidelity employee who recently joined Fidelity's competitor, Epiqwest Financial Corporation ("Epiqwest").

2.    While employed by Fidelity, Veve had access to Fidelity's confidential business information and trade secrets, including Fidelity's customer account information.  Veve executed two Employee Agreements wherein he promised, among other things, not to disclose or use

Fidelity's confidential business information and trade secrets outside of his employment-related duties for Fidelity.  Veve further agreed that, upon his separation from Fidelity, he would return to Fidelity all confidential information and trade secret information within his possession, and that he would refrain from soliciting Fidelity customers for a period of one year.

3.     On July 6, 2012, Veve provided Fidelity with written notice of his resignation, effective immediately.  Immediately after leaving Fidelity, Veve began his position as an investment advisor at Epiqwest.  Epiqwest, as an independent Registered Investment Advisor ("RIA"), provides services which are the same or highly similar to those offered by Fidelity, including, but not limited to, advising clients on investment matters and managing its clients' investment portfolios.  Fidelity competes with RIA's like Epiqwest for the advisory business of retail customers.

4.     Even before resigning, Veve began misappropriating Fidelity's customer information.  After he resigned, Veve immediately began using Fidelity trade secret customer data on behalf of his new employer, Epiqwest, in an effort to solicit Fidelity customers to transfer their business to Epiqwest.  Fidelity reminded Veve of his contractual non-disclosure and non-solicitation obligations and demanded that he immediately cease and desist his unlawful conduct.  To Fidelity's utmost surprise, however, Fidelity continues to receive reports that Veve is utilizing Fidelity's trade secret customer data to solicit and mislead Fidelity's customers.  Not only is Veve's conduct in flagrant disregard of his contractual duties to Fidelity, but it is also in violation of well-settled Colorado law.

5.     As a result of Veve's unlawful conduct, Fidelity has been and will continue to be irreparably harmed.  In addition to the loss of good will and customers' trust, Fidelity faces direct

financial loss as a result of Veve's actions insofar as certain Fidelity customers whose accounts were assigned to Veve have already transferred to Epiqwest.  Other customers are likely to do so in the future should Veve's unlawful solicitations continue.  The financial impact of these losses—although undeniably significant—is difficult to calculate, as it cannot be determined with certainty what future investment opportunities are lost with each departing customer.

6.      Fidelity, accordingly, requires a temporary restraining order because Fidelity has suffered, and faces an imminent threat of continuing to suffer, irreparable harm due to Veve's misappropriation of Fidelity's trade secret customer information, improper diversion of Fidelity's customers, breach of his duty of loyalty and his contractual obligations, and misleading of Fidelity's customers by representing that he is still affiliated with Fidelity, in violation of the Colorado Consumer Protection Act.  Further, it is imperative that Fidelity obtain a Court order mandating Veve's immediate return of any and all information pertaining to Fidelity's customers, including but not limited to, any "recreated" list containing any Fidelity customers' information, including Fidelity customers' names.

7.      Fidelity and Veve are subject to the arbitration rules and regulations of the Financial Industry Regulatory Authority ("FINRA") pursuant to FINRA Rule 13200. Accordingly, concurrently with the filing of this Complaint, Fidelity also is filing a Statement of Claims with FINRA seeking binding arbitration of this dispute in accordance with FINRA Rule 13804(a)(2), which requires the parties first to obtain a temporary restraining order from a Court of competent jurisdiction and then provides for an expedited hearing before FINRA for permanent injunctive relief.  Consequently, although the merits of this case ultimately should be resolved in arbitration before FINRA, Fidelity must first obtain a temporary restraining order

3

from this Court in order to have FINRA rule on its request for a permanent injunction on an expedited basis.   In the event a temporary restraining order is granted by this Court, the expedited FINRA hearing will be scheduled within 15 days of the entry of the Court order.  If no temporary restraining order is issued, the case will not be heard by FINRA on an expedited basis and, instead, will be assigned to standard-track arbitration, a course of action that would delay a hearing on the merits for a year or more.  ***Temporary and/or preliminary injunctive relief, therefore, is required to preserve the status quo until the merits of this case can be adjudicated by FINRA.***

## PARTIES

8.       Fidelity is a limited liability company, whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business located in Boston, Massachusetts.  Fidelity is qualified to conduct business, and carries on business in the State of Colorado.

9.       Veve is a former Account Executive in Fidelity's Broomfield, Colorado investor center, who is a citizen of the state of Colorado and, upon information and belief, resides in Erie, Colorado.  Veve is currently employed by Epiqwest in Lafayette, Colorado.

## JURISDICTION AND VENUE

10.       This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Indeed, Veve's conduct threatens approximately 750 customer accounts (or approximately 460 households), representing approximately $250 million in assets under Fidelity management.

11.     Venue is proper in this District Court pursuant to 28 U.S.C. § 1391(a) because Veve resides in this District and a substantial part of the events giving rise to Fidelity's claims occurred in this District.

<b><u>FACTS COMMON TO ALL CLAIMS FOR RELIEF</u></b>

A.     <b><u>Fidelity's Unique Customer Development Practices</u></b>

12.     Fidelity and its affiliates provide a variety of financial services – such as retirement plan services, insurance services, and retail brokerage services – to Fidelity customers, with whom Fidelity typically enjoys significant, long term relationships.

13.     Fidelity offers individual investors a broad assortment of trading and cash management features including buying and selling stocks, bonds, options and more than 5,100 mutual funds from Fidelity and other well-known fund companies.

14.     In addition, Fidelity offers a wide array of financial services, including retirement services, investment planning, wealth management, securities execution and clearing, life insurance services and equity services.

15.     Fidelity is unique in the retail brokerage field because Fidelity does not have its Account Executives make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity.

16.     Instead, Fidelity requires its Account Executives to develop service relationships based upon leads that Fidelity provides.

17.     Fidelity provides leads to its Account Executives from two primary sources.

18.     First, Fidelity forwards information to its representatives from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person.

19.     Fidelity and its affiliates devote tens of millions of dollars per year toward attracting customers to Fidelity's various businesses in a variety of means.

20.     Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity; Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity; Fidelity maintains multiple call centers that prospective customers can use to initiate contact with Fidelity; and, Fidelity maintains prominent retail locations which prospective customers can visit.

21.     A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity.

22.     Second, Fidelity forwards information to its representatives regarding customers, with whom Fidelity already has a relationship, who either: (a) experience a "triggering event," such as maturity of a Fidelity 401(k) account, which may lead to interest in Fidelity's retail financial services; or (b) have at least $250,000 in assets with Fidelity but do not currently have a relationship with any particular Account Executive.

23.     A significant portion of Fidelity's business is derived from servicing the needs of Fidelity's existing customers.

24.     Fidelity's lead-based approach to supporting its Account Executives distinguishes Fidelity from other full-service brokerages, where individual brokers, rather than the firm, are responsible for establishing customer relationships.

25.     Fidelity's success in its lead-based approach is based on the typically long-standing relationships it enjoys with its customers.

B.      **Fidelity's Trade Secret Customer Information**

26.     Fidelity's success with its unique lead-based approach to supporting Account Executives is directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets.

27.     Fidelity's trade secret customer data includes the names of and contact information for Fidelity customers, and includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth.

28.     Although certain information might be publicly available–such as an individual's name or published home telephone numbers–only a limited number of Fidelity employees know who among the general public are Fidelity customers, and therefore have a specific need for investment services.

29.     Fidelity developed its customer data through a significant investment of time, labor, and capital, as described above.

30.     Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will maintain sensitive, personally-identifiable information (including their identity as a customer, contact information and financial information) in confidence.

31.     Fidelity derives substantial economic value from preserving its customer data as a trade secret.  Although individual customers are periodically subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and address their needs without access to Fidelity's trade secret customer data.

32.     In this way, maintaining the confidentiality of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors.

C.      **Fidelity's Efforts To Preserve The Confidentiality Of Its Customer Data**

33.     Fidelity vigilantly preserves its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information.

34.     Fidelity does not provide its trade secret customer data to competitors.  Fidelity maintains its trade-secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided such access.

35.     Fidelity also maintains, and advises its employees of, a Confidentiality Policy that is displayed on Fidelity's intranet.  A true and correct copy of Fidelity's Confidentiality Policy is attached hereto as Exhibit 1.  Fidelity periodically reminds its employees of this policy.  Fidelity also preserves trade secret customer data by requiring each employee to execute a standard Fidelity Employee Agreement.

36.     Fidelity is vigilant in protecting its customers' privacy, because most Fidelity customers have not authorized Fidelity to share their contact or financial information outside of Fidelity.

37.     Fidelity is required by federal law to prevent the disclosure to third parties of nonpublic customer information, including contact information and financial information.  *See* 15 U.S.C. §§ 6801, *et. seq*.; 17 C.F.R. §§ 248.1, *et. seq*.

**D.**      **Veve's Employee Agreements With Fidelity**

38.      One way that Fidelity preserves confidential and trade secret customer data is by requiring each employee to execute a standard Fidelity Employee Agreement.

39.      On August 11, 2010, at the inception of his employment and as a condition of his employment, Veve signed an Employee Agreement.  A true and correct copy of Veve's August 10, 2010 Employee Agreement is attached hereto as Exhibit 2.

40.      Veve signed a second, nearly-identical Employee Agreement on November 30, 2010.  A true and correct copy of Veve's November 30, 2010 Employee Agreement is attached hereto as Exhibit 3.

41.      In the Employee Agreements, Veve acknowledged the confidentiality of Fidelity's data and records, including in particular Fidelity's customer lists and customer information.  Veve also promised to use Fidelity's Confidential Information only in the course of his employment with Fidelity and not to divulge Fidelity's Confidential Information to third parties.

42.      Moreover, Veve agreed to refrain from soliciting Fidelity customers during, and for one year after the termination of, his employment with Fidelity.

43.      Importantly, Veve further agreed that any violation of the Employee Agreement would cause Fidelity irreparable damage and would entitle Fidelity to seek emergency injunctive relief to protect its Confidential Information.

44.      As consideration for the Employee Agreements, Fidelity hired and employed Veve, compensated him throughout his employment, and provided him with introductory and continuing on-the-job training.

45. Fidelity provided Veve with the above-described leads to enable Veve to succeed at Fidelity.

46. Fidelity further provided Veve with support services; paid for facilities, computer equipment, market reporting services, and all other business expenses; and registered Veve with the Financial Industry Regulatory Authority ("FINRA").

47. Fidelity provided Veve with sales assistance, research, the benefit of Fidelity advertising, goodwill and name recognition, access and use of experts in asset management, tax, estate planning and insurance, and with promotional marketing and sales support.

48. In consideration for the foregoing benefits and opportunities that Fidelity provided to Veve, Veve agreed in his August 11, 2010 and November 30, 2010 Employee Agreements as follows:

> 1. Confidential Information. To assist Employee in the performance of his/her duties, the Fidelity Companies agree to provide to Employee training and/or education regarding the Fidelity Companies' business methods and agree to provide to Employee access to certain Confidential Information belonging to the Fidelity Companies. Confidential Information consists of all information pertaining to the business of any of the Fidelity Companies that is not generally known to the public at the time made known to Employee. It includes but is not limited to trade secrets; secret, confidential, and proprietary information; information protected by the attorney-client privilege; marketing, financial, research, trading, portfolio, and sales information; computer passwords and program designs; proprietary computer software designs and hardware configurations; proprietary technology; new product and service ideas; business, pricing, and marketing plans; customers, prospect, vendor and personnel lists; financial and other personal information regarding customers and employees; confidential information about other companies and their products; and information expressly designated as 'Fidelity Highly Confidential," "Fidelity Confidential," or "Fidelity Internal." All Confidential Information is imparted to Employee in a relationship of confidence. As a condition and in consideration of

10

the Fidelity Companies' agreement to provide Employee with training and/or education and Confidential Information, Employee agrees that during his/her employment and thereafter, Employee will not copy, reproduce, use, disclose, or discuss in any manner, in whole or in part, any Confidential Information unless (1) necessary for Employee to carry out his/her job; (2) necessary for employees or other agents of the Fidelity Companies to carry out their duties and responsibilities; or (3) authorized in writing by the Fidelity Companies. Employee also will not retain any copies, notes, or excerpts of Confidential Information upon termination of his/her employment. Employee will promptly notify the Fidelity Companies of any Inadvertent, unauthorized, or negligent copying, reproduction, use, disclosure, or discussion of Confidential Information. Employee will not open, read, or in any way access Confidential Information without authorization.

\*       \*       \*

3.   <u>Company Property</u>.   Upon termination of Employee's employment, in the event Employee's employment no longer requires access to Confidential Information, or at any earlier time as requested by the Fidelity Companies, Employee will return all company property, including but not limited to his/her Identification badge, company credit cards, company-owned equipment (such as cellular telephones, beepers, and laptop computers), and all documents and materials received from or created for or by any of the Fidelity Companies, including but not limited to Confidential Information.

\*       \*       \*

6.   <u>Non-solicitation</u>. In consideration of the training and/or education and access to Confidential Information provided by the Fidelity Companies, and so as to enforce Employee's agreement regarding such Confidential Information, Employee agrees that during his/her employment and for a period of one year following his/her separation from employment by the Fidelity Companies, Employee will not use any Confidential Information belonging to the Fidelity Companies to directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer of the Fidelity Companies to divert or take away all or any portion of his/her/its business from the Fidelity Companies or otherwise cease the relationship with the Fidelity Companies.

11

During this same period, Employee will not directly or indirectly, on his/her own behalf or on behalf of anyone else or any company, solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee otherwise learned during the course of Employee's employment with the Fidelity Companies. Employee also will not, directly or Indirectly, on his/her own behalf or on behalf of anyone or any company, hire, solicit in any manner, or induce or attempt to induce any employee of any of the Fidelity Companies to leave his/her employment.

*    *    *

10.   <u>Miscellaneous</u>. …. Any violation of this Agreement will cause irreparable damage to the Fidelity Companies or any of them. Therefore, the Fidelity Companies or any of them shall have the right to seek specific enforcement of this Agreement through equitable and injunctive relief, in addition ot any other remedies available.

(Ex. 3 at ¶¶ 1, 3, 6, and 10; *see also* Ex. 2 at ¶¶ 1, 3, 6, and 10.)

### E.   **Fidelity Assigned Veve A List of 750 Customers To Service, And Provided Him With Confidential Customer Information About Those Customers.**

49.   At the time of his resignation on Friday, July 6, 2012, Veve worked in Fidelity's retail brokerage operations as an Account Executive at Fidelity's Broomfield, Colorado branch office.

50.   As an Account Executive, Veve was assigned a list of existing Fidelity customers that he and an assigned customer service representative were required to service on behalf of Fidelity.

51.   In order for Veve to service these customers, he required and was given access to their confidential personal and financial information.

52.     At the time of his departure, Veve's assigned list was comprised of approximately 750 customer accounts (or approximately 460 households), representing approximately $250 **million** in assets under Fidelity management.

53.     Veve was specifically provided contact and confidential financial information for each of these customers.

    **F.**     **In The Months And Days Prior To His Resignation, Veve Had An Extremely Low Client Contact Rate And Accessed A Client List That Was Mysteriously Removed Before He Resigned.**

54.     Fidelity keeps track of each Account Executive's client contact ratio, which is determined by what percentage of their book each representative has reached out to with a telephone call or an in-branch appointment within the last 120 days or four months.

55.     In the four months before his departure from Fidelity, Veve only contacted approximately 30% of the customers he was assigned to service.  This means that he did not contact 70% of his customers in the 120 days before he left Fidelity.

56.     Based on the reports of Fidelity customers, though, it appears that Veve began calling many of these customers within hours of his resignation on Friday, July 6, 2012.  But after his resignation, Veve was calling on behalf of Epiqwest, a Fidelity competitor.  And even though he was calling on behalf of Epiqwest, Veve did not make it clear that he was no longer with Fidelity.  In fact, in many circumstances, Veve affirmatively misled customers to believe he was still with Fidelity.

57.     Fidelity has also uncovered information that indicates Veve accessed and then likely removed a spreadsheet containing customer personal and financial information just days before his resignation.

58.     As part of Fidelity's investigation into Veve's improper conduct, Fidelity's Technology Investigations Group collected and reviewed computer hard drive data for Veve's office desktop computer.  The Technology Investigations Group completed their analysis on July 25, 2012.

59.     Each time a document is opened or accessed, a .lnk or "link" file is automatically created (or updated) in the "Recent" folder.  A link file contains information such as the last date a file was accessed from the computer and the location of the file.  Links may point to files the user accessed over a network but never saved locally. The link file acts as a shortcut, allowing the user to open the document more quickly the next time it is accessed.

60.     Through its investigation, Fidelity determined that on July 3, 2012 – three days before he resigned – Veve accessed a file named "Eric Book.xls" located in a folder called "Eric's Stuff" on a shared drive at Fidelity.

61.     The file has since been removed, and Fidelity has not been able to recover any portion of the document.

62.     Veve had access to the shared folder where this document was located, and it would not have been difficult for him to delete the file.

63.     Fidelity has learned from Hillary Reising, who was Veve's assistant, that this spreadsheet likely contained confidential personal and financial information about each of the clients Veve was assigned to serve on behalf of Fidelity, including contact information, type of account, total assets and notes regarding which clients Veve spoke with about which particular products.  This is consistent with Fidelity's practice of referring to a particular representative's list of assigned customers as their "book."

64.     In fact, last year, Veve asked Ms. Reising to input notes from her client interactions on to this spreadsheet as well.  Shortly before his resignation, Veve asked Ms. Reising if she used the file.  Ms. Reising told Veve that she had not used the spreadsheet for months, because Fidelity records that type of information in its customer interaction software system.

65.     When the Technology Investigations Group and Ms. Reising went to look for the spreadsheet after Veve's resignation, it had been removed.

**G.     Veve Was Reminded When He Resigned Of His Obligations Not To Solicit Fidelity Customers And To Preserve The Confidentiality Of Fidelity's Trade Secret Customer Data**

66.     Veve resigned from Fidelity on July 6, 2012 at 9:45 a.m., effective immediately. Veve resigned in person, by handing in his resignation to his branch manager, C. Nick Powell.

67.     When Veve handed Mr. Powell his resignation letter, Mr. Powell provided him with a copy of his Fidelity Employee Agreement and told him that Fidelity takes the protection of its confidential customer information very seriously.

68.     On the date that Veve resigned, he was scheduled to have a meeting with Mr. Powell to discuss his performance during the first half of 2012.  Veve's activity and work performed on his book of business was significantly below his peers, and he was ranked last in his peer group.  The discussion was to center on ways to improve performance, however it was preempted by Veve's resignation.

**H.     Veve's Misappropriation And Use Of Fidelity's Trade Secret Customer Information And Solicitation of Fidelity Customers**

69.     In the first several days after Veve left Fidelity and joined Epiqwest, Fidelity received reports that Veve was calling and meeting with Fidelity customers.

15

70.     These customers reported that they received telephone calls from Veve soon after his resignation, including many on Saturday, July 7, 2012.

71.     Fidelity requires, as part of its customer interaction policy, that representatives record qualifying customer interactions into a system called "Siebel," Fidelity's customer interaction software.  The records created in Siebel are made by the individual who interacted with the customer soon after the interaction occurs, as required by Fidelity, and are created, kept and maintained by Fidelity in the ordinary course of its business.  Accordingly, the Siebel notes tracked and maintained the reports Fidelity was receiving from its customers regarding Veve's solicitations of them.

72.     Ms. Hillary Reising, a Fidelity Private Client Specialist who worked with the same customers as Veve, was involved in contacting many of the customers Veve served while he was at Fidelity to let them know he was no longer with the firm and another representative would be assigned.

73.     Shockingly, several Fidelity customers contacted by Veve reported that Veve failed to mention he had left Fidelity and actively misled them into thinking was still associated with Fidelity but had merely switched roles or offices within Fidelity.

74.     These Fidelity customers expressed that they felt very confused by Veve's conduct, and were upset to learn that he was working for a competitor rather than for another group within Fidelity, which is what he had represented when he called them after his resignation.

75.     Other Fidelity customers contacted by Veve reported that Veve told them he had left to join Epiqwest, extolled the purported benefits of transferring the management of their

16

accounts away from Fidelity to Veve at Epiqwest, and sought to set up in-person appointments to continue his solicitation efforts.

76.     Indeed, some Fidelity customers have recently reported that Veve first informed them of his intention to move to Epiqwest as early as June 15, 2012 – three weeks before his resignation.

77.     Upon learning of these customer reports, Fidelity immediately became concerned that Veve was using Fidelity's confidential and trade secret customer information in an attempt to solicit Fidelity customers to transfer their business from Fidelity to Epiqwest, which directly competes with Fidelity in offering investment planning, wealth management and other financial services to customers.

78.     Fidelity was also alarmed by Veve's misrepresentations that he continued to be associated with Fidelity, and his active deception of Fidelity customers.

79.     This information was reported to Leslie Blickenstaff, in-house counsel for Fidelity, who reached out to Veve in an ongoing effort to resolve the issue, which will be explained in detail below.

80.     Despite early efforts to remind Veve of his contractual obligation to maintain the confidentiality of Fidelity's trade secret customer information and refrain from soliciting Fidelity's customers, Fidelity has continued to receive the following reports that Veve is soliciting Fidelity customers to transfer the management of their accounts to Epiqwest and misleading Fidelity customers regarding his relationship to Fidelity:

- G████ W█████ left a message for Fidelity Private Client Specialist Hillary Reising on July 9, 2012, stating that he was trying to get a hold of Veve. Mr. W█████ reported that Veve had called his home phone number on Friday, July 6th – the day that he resigned – "from the new group that he's working with" to make an appointment with Mr. W█████ to discuss his accounts. Mr. W█████ was interested in changing the time of his appointment, and was stunned and confused when Ms. Reising informed him that Veve was no longer affiliated with Fidelity. Mr. W█████ reported that Veve did not tell him the name of the new group he was working with and made it sound like he was just changing groups within Fidelity.

- D████ L█████ reported to Fidelity on July 9, 2012 that Veve had called him on Saturday, July 7th to tell Mr. L█████ that he had switched firms and to discuss the new investment options he could provide at Epiqwest.

- L███ A█████ reported to Fidelity on July 10, 2012 that Veve had called her on Saturday, July 7th to tell her that he had left Fidelity.

- K███ K█████ reported to Fidelity on July 11, 2012 that Veve had already contacted her and that they were scheduled to meet that day to discuss her accounts. Later the same day, Ms. K█████ informed Fidelity that she had decided to close her account so that she could be "more versatile" with the money.

- J███ "S███" A█████ reported to Fidelity on July 12, 2012 that Veve had contacted him and that he was scheduled to meet with Veve the same day to discuss account performance.

- L███ B█████ reported to Fidelity on July 12, 2012 that Veve had called him on July 11th and spoken to his wife. Veve told Mrs. B█████ that he was now with a different group within Fidelity called "Fidelity Industrial" or something with a similar name. Mr. B█████ also reported that Veve had called once before, about a week beforehand, but the B█████ were not available at that time so Veve had followed up on July 11th.

- H███ and J██ H█████ reported to Fidelity on July 12, 2012 that Veve had actually told them on June 15th that he would be leaving the Broomfield branch office. They reported that Veve made it sound like he would be staying with Fidelity, but just transitioning to another group, and that Veve told them he would be in contact

with them after the move. They were confused to learn that Veve had resigned from Fidelity, and was in fact working for a competitor.

- H██ G█████ reported to Fidelity on July 17, 2012 that Veve had called him "about a week ago around 7 p.m." Veve told Mr. G█████ that he had transitioned to another group that was still affiliated with Fidelity, and that if Mr. G█████ would just pay a little more money, Veve could get him better results. Mr. G█████ also reported that Veve gave him a package to look through regarding the product he was recommending. Mr. G█████ was confused and frustrated when he learned that Veve was no longer affiliated with Fidelity and was, in fact, working for a competitor.

- R█████ R████████ reported to Fidelity on July 18, 2012 that Veve had reached out to her and that she was meeting with him that afternoon. The next day, Ms. R██████ called Fidelity and indicated that she was closing her account and transferring the management of the portfolio over to Veve at Epiqwest.

- On July 26, 2012, Fidelity Private Client Specialist Hillary Reising received a voicemail from J███ L████. Mr. L████ reported that Veve contacted him and asked him to transfer his assets to Veve. Mr. L████ declined to do so.

- C███ R██████ reported to Fidelity on July 30, 2012 that Veve contacted her late last week, set up an in-person appointment, and told her that his managed product would outperform Fidelity.

81.     The only way Veve could have had knowledge of these customers, their contact information and certain account details pertaining to them, is by using confidential and trade secret information that he misappropriated from Fidelity during his employment.

82.     Moreover, Veve is calling only a subset of the customers he serviced at Fidelity that have a particular type of managed account, known at Fidelity as Portfolio Advisory Services, and telling them he can obtain better results for them at Epiqwest.

83.     It would be extremely hard to identify the particular customers with this type of account – which constitute only about 30% of his book – without a list.

84.     The reports flowing in from Fidelity's customers, therefore, strongly suggested that Veve has in his possession and is using on behalf of his new employer, Epiqwest, Fidelity's confidential and trade secret customer information.

I.      **Fidelity's Efforts To Resolve This Situation Without Court Intervention**

85.     After receiving the first few customer reports detailed above, Fidelity sent a letter to Veve on July 11, 2012.  In this letter, Fidelity indicated that it had reason to believe Veve was contacting and soliciting Fidelity customers, and Fidelity asked that he cease and desist from this conduct immediately.

86.     Fidelity also reminded him that, pursuant to his Employee Agreement, he was and is not permitted to use or disclose Fidelity customer information, including names, addresses, email addresses, telephone numbers, and account information (which would include portfolio worth, asset distribution, risk tolerance, and investment strategy and goals).

87.     In addition, Fidelity formally requested that Veve return to Fidelity all such confidential and trade secret information in his possession.

88.     Trent Culver, the President of Epiqwest, was copied in the letter.

89.     Veve did not return any information or respond to the cease and desist letter in any way.

90.     Fidelity has an ongoing business relationship with Epiqwest.  In an effort to preserve this business relationship, Fidelity worked with the Fidelity Relationship Manager assigned to Epiqwest – Rebeca Perez – to ensure that Epiqwest was aware of Veve's improper conduct.

91.     Ms. Perez contacted Mr. Culver soon after Fidelity sent the July 11, 2012 letter.

92.     She explained that Fidelity takes these situations very seriously and encouraged Mr. Culver to get Veve to stop soliciting Fidelity customers and misrepresenting that he was still employed by or affiliated with Fidelity.

93.     Mr. Culver stated that he did not believe non-solicitation agreements were recognized in Colorado, but agreed to speak to Veve.

94.     Fidelity continued to monitor this situation.  When Fidelity continued to receive reports of Veve soliciting and confusing customers about his relationship with Fidelity, Fidelity asked Ms. Perez to reach out to Mr. Culver for a second time.

95.     Ms. Perez called Mr. Culver on July 18, 2012.  Mr. Culver told Ms. Perez that he had spoken with Veve and that Veve denied soliciting Fidelity customers or misleading customers into thinking he was still affiliated with Fidelity.

96.     Ms. Perez encouraged Mr. Culver to speak with Veve again because his report contradicted information Fidelity was receiving from its customers.  Mr. Culver said that he would speak to Veve again.

97.     On July 25, 2012, Ms. Perez spoke to Todd Miller, Epiqwest's Operations Manager.  Mr. Miller told Ms. Perez that he had spoken with Veve, and Veve denied soliciting Fidelity customers.

98.     Customers continue to report to Fidelity that they have been contacted by Veve, that Veve has solicited their business, and that Veve is intentionally misrepresenting that he is still affiliated with Fidelity despite his departure to join a competing firm.

99.     Veve's refusal to acknowledge his wrongful conduct indicates that his unlawful behavior will not stop unless this Court enters the requested injunction.

**J.** **Fidelity Faces A Threat Of Immediate And Irreparable Harm From Veve's Conduct**

100.    Since Veve resigned from Fidelity, at least three customers that Veve previously serviced on behalf of Fidelity have expressed their intention to transfer their accounts.

101.    Two of these customers have confirmed that they intend to transfer their accounts to Veve at Epiqwest, while the other was evasive but called to initiate the transfer just hours after meeting with Veve.

102.    Veve's conduct has irreparably harmed Fidelity and will continue to irreparably harm Fidelity if not stopped immediately.

103.    Indeed, Veve's conduct has and will continue to irreparably harm Fidelity's relationships with its customers by causing Fidelity to lose good will, future business or referrals. Customers may lose trust and confidence in Fidelity's ability to secure inherently private information as a result of Veve's ongoing, wrongful conduct.

104.    This damage is incalculable as Fidelity cannot put a price on the value of its customer relationships and the damage caused when Veve took and improperly misused confidential customer information on behalf of a competitor.

105.    Fidelity customers have an expectation that their confidential contact and financial information, such as their net worth, risk tolerances, investment goals, and preferences, will be protected.

106.    Thus, customers understandably are concerned when former Fidelity employees, such as Veve, have access to their information and are using it to solicit their business at a new and different brokerage institution.

107.    Fidelity is also irreparably damaged by the actual and threatened loss of customer goodwill and the loss of assets caused by Veve's misrepresentations to Fidelity customers that he simply changed jobs within Fidelity rather than leaving for a competitor.

108.    Fidelity's relationships with its customers are incalculably harmed by false representations of affiliation, because it cannot control the content or quality of service provided by unaffiliated individuals.

109.    This damage is also incalculable as Fidelity cannot put a price on the value of its customer relationships and goodwill.

110.    In addition to the loss of customers' trust and good will, Fidelity faces direct financial loss insofar as certain customers, Fidelity has learned, have decided to transfer the management of their accounts to Veve at Epiqwest, and other customers are likely to do so in the future should Veve's solicitations and misrepresentations continue.

111.    The financial impact of these losses – although undeniably significant – is especially difficult to calculate, as it cannot be determined with certainty what future investment opportunities are lost with each departing customer.

112.    Faced with Veve's intentional misappropriation of Fidelity's confidential and trade secret customer information, Veve's misrepresentations to Fidelity customers regarding his affiliation (or lack thereof) with Fidelity, Veve's demonstrably false reports in response to Fidelity's attempts to work with Veve and Epiqwest to resolve these issues, and the resultant irreparable harm to Fidelity, Fidelity is left with no alternative but to seek immediate redress from this Court and FINRA.

## FIRST CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets in Violation of the
### Colorado Uniform Trade Secrets Act, C.R.S., § 7-74-101 *et seq.*)

113.    Fidelity hereby realleges and incorporates by reference the allegations of paragraphs 1 through 112 of the Complaint, inclusive, as though set forth in full.

114.    The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Veve pursuant to the Colorado Uniform Trade Secrets Act ("CUTSA"), C.R.S., § 7-74-101 *et seq.*, in one or more of the following respects.

115.    Fidelity's trade secret customer data is one of its most important assets and was developed through a significant investment of time, labor and capital.

116.    Fidelity's above-described trade secrets, including the contact and confidential financial information of Fidelity customers, are subject to reasonable efforts by Fidelity to maintain their secrecy and/or confidentiality.  Fidelity maintains its trade-secret customer data on password-protected computers, restricts access to only those employees whose jobs require it, and maintains and informs its employees of a comprehensive Confidentiality Policy.  Fidelity also preserves trade secret customer data by requiring each employee to execute a standard Fidelity Employee Agreement.  Fidelity does not provide its trade secret customer data to competitors, and Fidelity's customer information is not generally known.

117.    Fidelity derives a significant economic benefit from maintaining the secrecy and confidentiality of the above-described trade secrets.

118.    Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law, from Veve's ongoing misappropriation and misuse of Fidelity's trade secret customer information.

24

119.   Unless Veve is preliminarily and permanently enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

    (a)   Disclosure of trade secrets, customer lists, and other confidential information that is solely the property of Fidelity and its customers;

    (b)   Loss of confidentiality of clients' records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

    (c)   Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

120.   Veve's conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets.

WHEREFORE, Fidelity prays that this Court:  (i) award Fidelity damages arising out of Veve's wrongful conduct, including compensatory and exemplary damages pursuant to C.R.S., § 7-74-104, (ii) award Fidelity the cost of its reasonable attorneys' fees pursuant to C.R.S., § 7-74-105, (iii) enter emergency injunctive relief and judgment in favor of Fidelity and against defendant Veve to enjoin defendant Veve from, directly or indirectly, and whether acting alone or in concert with others, until hearing and thereafter until further Order of this Court, the following:

    (a)   soliciting, whether directly or indirectly, and whether alone or in concert with others, any business from any Fidelity customer whom Veve served or any customer, individual or entity whose name became known to Veve while in the employ of Fidelity, including, without limitation, all customers, individuals or entities that Veve learned of through his employment with Fidelity; and

    (b)   using, disclosing, transmitting and continuing to possess for any purpose, including solicitation of customers, the information contained in the records of Fidelity, including, but not limited to, the names, addresses, and confidential financial information of any customer, individuals or entities who Veve learned of through his employment with Fidelity.

Additionally, Fidelity requests that the Court order:

(c)     Veve, and anyone acting in concert with him, including any agent, employee, officer or representative of Veve's new employer, to return to Fidelity any and all records, documents and/or information pertaining to Fidelity customers, whether in electronic, handwritten or any other form within five (5) days of entry of this order, including any and all copies.  This requirement includes all   records      or documents, in any form, created by Veve, or anyone acting in concert with him, based on documents or information that was received or removed from Fidelity by Veve;

(d)     Veve to file a declaration attesting that he has returned to Fidelity all information subject to this Court's Order within seven (7) days from the entry of this Court's Order; and

(e)     Fidelity and Veve, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3-4, to proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract — Non-Solicitation / Non-Disclosure)

121.     Fidelity hereby realleges and incorporates by reference the allegations of paragraphs 1 through 120 of the Complaint, inclusive, as though set forth in full.

122.     Veve agreed not to solicit, directly or indirectly, in any manner or induce or attempt to induce any Fidelity customer for a period of one year after his separation from employment with Fidelity.  (*See* Exs. 2-3 at ¶ 1.)

123.     Veve agreed not to copy, disclose, or discuss in any manner any Confidential Information as defined in the Employee Agreements unless it was necessary for him to carry out his duties on behalf of Fidelity, and not to retain any copies of Fidelity Confidential Information when he left Fidelity.  (*See* Exs. 2-3 at ¶ 6.)

124.     Veve breached the non-solicitation, confidentiality, and non-disclosure provisions of his Employee Agreements by the conduct described above.

125.     Veve continues to violate his contractual obligations, and will continue to violate those obligations in the future unless he is immediately enjoined by this Court.

126.     As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as unascertainable financial loss.

127.     Unless Veve is enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

    (a)    Disclosure of trade secrets, customer lists, and other confidential information that is solely the property of Fidelity and its clients;

    (b)    Loss of confidentiality of clients' records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

    (c)    Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

WHEREFORE, Fidelity prays that this Court award Fidelity damages arising out of Veve's wrongful conduct and enter emergency injunctive relief and judgment in favor of Fidelity and against defendant Veve to enjoin him, directly or indirectly, and whether acting alone or in concert with others, until hearing and thereafter until further Order of this Court, from:

    (a)    soliciting, whether directly or indirectly, and whether alone or in concert with others, any business from any Fidelity customer whom Veve served or any customer, individual or entity whose name became known to Veve while in the employ of Fidelity, including, without limitation, all customers, individuals or entities that Veve learned of through his employment with Fidelity; and

    (b)    using, disclosing, transmitting and continuing to possess for any purpose, including solicitation of customers, the information contained in the records of Fidelity, including, but not limited to, the names, addresses, and confidential financial information of any customer, individual or entity who Veve learned of through his employment with Fidelity.

Additionally, Fidelity requests that the Court order:

(c)     Veve, and anyone acting in concert with him, including any agent, employee, officer or representative of Veve's new employer, to return to Fidelity any and all records, documents and/or information pertaining to Fidelity customers, whether in electronic, handwritten or any other form within five (5) days of entry of this order, including any and all copies.  This requirement includes all   records       or documents, in any form, created by Veve, or anyone acting in concert with him, based on documents or information that was received or removed from Fidelity by Veve;

(d)     Veve to file a declaration attesting that he has returned to Fidelity all information subject to this Court's Order within seven (7) days from the entry of this Court's Order; and

(e)     Fidelity and Veve, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3-4, to proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure.

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty / Duty of Loyalty)

128.     Fidelity hereby realleges and incorporates by reference the allegations of paragraphs 1 through 127 of the Complaint, inclusive, as though set forth in full.

129.     Veve, as an employee of Fidelity, had access to Fidelity's confidential and trade secret information, and was required to exercise the utmost good faith and loyalty in the performance of his duties during and after his employment by Fidelity, as required by his Employee Agreements and Colorado law.

130.     Veve breached this duty of good faith and loyalty by misappropriating Fidelity trade secret information while still employed by Fidelity and using that information for the benefit of Fidelity's competitor and Veve's current employer, *i.e.*, Epiqwest, while Veve was still employed by Fidelity and thereafter.

131.     Veve also breached his duty of good faith and loyalty by telling Fidelity customers of his impending departure as early as June 15, 2012 – several weeks before he abruptly resigned from Fidelity without notice.

132.     Fidelity is informed and believes, and on that basis alleges, that Veve's unlawful conduct will continue unless he is immediately enjoined by this Court.

133.     As a direct and proximate result of Veve's unlawful conduct, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as financial loss.

134.     Unless Veve is temporarily or preliminarily enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

    (a)     Disclosure of trade secrets, customer lists, and other confidential information that is solely the property of Fidelity and its clients;

    (b)     Loss of confidentiality of clients' records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

    (c)     Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

135.     Thus, Fidelity is entitled to an award of damages arising out of Veve's wrongful conduct, as well as to temporary, preliminary and permanent injunctive relief.

WHEREFORE, Fidelity prays that this Court award Fidelity damages arising out of Veve's wrongful conduct and enter emergency injunctive relief and judgment in favor of Fidelity and against defendant Veve to enjoin him, directly or indirectly, and whether acting alone or in concert with others, until hearing and thereafter until further Order of this Court, from:

    (a)     soliciting, whether directly or indirectly, and whether alone or in concert with others, any business from any Fidelity customer whom Veve served or any

customer, individual or entity whose name became known to Veve while in the employ of Fidelity, including, without limitation, all customers, individuals or entities that Veve learned of through his employment with Fidelity; and

(b)     using, disclosing, transmitting and continuing to possess for any purpose, including solicitation of customers, the information contained in the records of Fidelity, including, but not limited to, the names, addresses, and confidential financial information of any customer, individual or entity who Veve learned of through his employment with Fidelity.

Additionally, Fidelity requests that the Court order:

(c)     Veve, and anyone acting in concert with him, including any agent, employee, officer or representative of Veve's new employer, to return to Fidelity any and all records, documents and/or information pertaining to Fidelity customers, whether in electronic, handwritten or any other form within five (5) days of entry of this order, including any and all copies. This requirement includes all   records     or documents, in any form, created by Veve, or anyone acting in concert with him, based on documents or information that was received or removed from Fidelity by Veve.

(d)     Veve to file a declaration attesting that he has returned to Fidelity all information subject to this Court's Order within seven (7) days from the entry of this Court's Order; and

(e)     Fidelity and Veve, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3-4, to proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure.

## FOURTH CLAIM FOR RELIEF

### (Violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-105)

136.    Fidelity hereby realleges and incorporates by reference the allegations of paragraphs 1 through 135 of the Complaint, inclusive, as though set forth in full.

137.    Veve has engaged and continues to engage in unfair and deceptive trade practices by knowingly passing off his services as performed on behalf of Fidelity and knowingly making false representations as to his affiliation (or lack thereof) with Fidelity after his resignation in violation of C.R.S., § 6-1-105(1)(a), (b), (c), and (e).

138.    At the time Veve knowingly passed off his services as performed on behalf of Fidelity and knowingly made false representations as to his affiliation (or lack thereof) with Fidelity, Veve knew that his statements to Fidelity customers were untrue, or recklessly and willfully made them without regard to the likelihood that Fidelity customers would be confused.

139.    Veve engaged in the above-described unfair and deceptive trade practices in bad faith.  Veve intended to mislead and deceive Fidelity customers into believing that he was still affiliated with Fidelity, and actively concealed that he had left Fidelity and was instead contacting Fidelity customers on behalf of a competitor for the purpose of soliciting their business.

140.    Veve engaged in these unfair and deceptive trade practices as part of, during the course of, and for the purpose of advancing his work for Epiqwest.

141.    Veve's unfair and deceptive conduct significantly impacts the public.  Veve has engaged in the above-described unfair and deceptive trade practices on a routine basis since resigning from Fidelity on July 6, 2012, as demonstrated by the myriad customer reports detailed above.   While he was with Fidelity, Veve was responsible for servicing the accounts of approximately 750 customers from approximately 460 households.   Even if he is only misrepresenting the nature of his move to Epiqwest to 25% of these customers – a number that, Fidelity suggests, is in all likelihood much closer to 75% – Veve has confused and/or deceived well over a hundred financial services consumers.

142.    As a direct and proximate result of Veve's unlawful conduct, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as financial loss.

143.    Unless Veve is temporarily or preliminarily enjoined from the foregoing conduct, Fidelity will be irreparably harmed by the loss of goodwill and loss of business reputation that occurs when customers discover that Veve misled them regarding his departure from Fidelity. Fidelity's relationships with its customers are incalculably harmed by Veve's false representations of affiliation, because Fidelity cannot control the content or quality of service provided by unaffiliated individuals.

144.    Unless Veve is temporarily or preliminarily enjoined from the foregoing conduct, Fidelity will also suffer present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

145.    Thus, Fidelity is entitled to an award of treble damages arising out of Veve's wrongful conduct and attorneys' fees, as well as to temporary, preliminary and permanent injunctive relief.

WHEREFORE, Fidelity prays that this Court:

(a)    award Fidelity treble damages arising out of Veve's wrongful conduct as well as attorneys' fees;

(b)    enter emergency injunctive relief and judgment in favor of Fidelity and against defendant Veve to enjoin him, directly or indirectly, and whether acting alone or in concert with others, until hearing and thereafter until further Order of this Court, from representing to any person, including but not limited to Fidelity customers whom Veve served or any customer, individual or entity whose name because known to Veve while in the employ of Fidelity, that he is employed by or affiliated with Fidelity in any way; and

(c)    direct Fidelity and Veve, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3-4, to proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure.

## FIFTH CLAIM FOR RELIEF

### (Injunctive Relief)

146. Fidelity hereby realleges and incorporates by reference the allegations of paragraphs 1 through 145 of the Complaint, inclusive, as though set forth in full.

147. In doing the acts described herein, Veve, has harmed Fidelity by, among other things, improperly garnering, retaining, disclosing and utilizing Fidelity's confidential and proprietary information and trade secrets, in violation of Veve's Employee Agreement and Colorado law, to give Veve a competitive edge over Fidelity, attempting to poach Fidelity's customer accounts, misleading Fidelity customers about the fact that he is no longer associated with Fidelity, and diminishing Fidelity's reputation and good will.

148. Veve's unlawful conduct has continued in the face of multiple requests by Fidelity that it cease and desist. Accordingly, Fidelity is informed and believes that Veve's unlawful conduct will continue unabated unless he is immediately enjoined by this Court.

149. As a direct and proximate result of Veve's unlawful conduct, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as financial loss.

150. Unless Veve is temporarily or preliminarily enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

  (a)   Disclosure of trade secrets, customer lists, and other confidential information that is solely the property of Fidelity and its clients;

  (b)   Loss of confidentiality of clients' records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation; and

(c)     Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

WHEREFORE, Fidelity prays that this Court enter emergency injunctive relief and judgment in favor of Fidelity and against defendant Veve to enjoin him, directly or indirectly, and whether acting alone or in concert with others, until hearing and thereafter until further Order of this Court, from:

(a)     soliciting, whether directly or indirectly, and whether alone or in concert with others, any business from any Fidelity customer whom Veve served or any customer, individual or entity whose name became known to Veve while in the employ of Fidelity, including, without limitation, all customers, individuals or entities that Veve learned of through his employment with Fidelity; and

(b)     using, disclosing, transmitting and continuing to possess for any purpose, including solicitation of customers, the information contained in the records of Fidelity, including, but not limited to, the names, addresses, and confidential financial information of any customer, individual or entity who Veve learned of through his employment with Fidelity; and

(c)     representing to any person, including but not limited to Fidelity customers whom Veve served or any customer, individual or entity whose name because known to Veve while in the employ of Fidelity and all customers, individuals or entities whoVeve learned of through his employment with Fidelity, that he is employed by or affiliated with Fidelity in any way.

Additionally, Fidelity requests that the Court order:

(d)     Veve, and anyone acting in concert with him, including any agent, employee, officer or representative of Veve's new employer, to return to Fidelity any and all records, documents and/or information pertaining to Fidelity customers, whether in electronic, handwritten or any other form within five (5) days of entry of this order, including any and all copies.  This requirement includes all   records       or documents, in any form, created by Veve, or anyone acting in concert with him, based on documents or information that was received or removed from Fidelity by Veve.

(e)     Veve to file a declaration attesting that he has returned to Fidelity all information subject to this Court's Order within seven (7) days from the entry of this Court's Order; and

34

(f)     Fidelity and Veve, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3-4, to proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure.

## BOND

151.    Fidelity respectfully requests that the Court issue a temporary restraining order or a preliminary injunction without requiring Fidelity to post a bond.  However, if the Court requires it, Fidelity is willing to post a bond or cash in lieu of bond in the appropriate amount upon entry of the temporary restraining order or preliminary injunction.

## CONCLUSION

WHEREFORE, Fidelity prays that this Court enter a temporary restraining order or preliminary injunction in favor of Fidelity and against Veve to enjoin Veve, pending arbitration before the Financial Industry Regulatory Authority or further Order of this Court, from committing the following acts:

(a)     soliciting, whether directly or indirectly, and whether alone or in concert with others, any business from any Fidelity customer whom Veve served or any customer, individual or entity whose name became known to Veve while in the employ of Fidelity;

(b)     using, disclosing, transmitting and continuing to possess for any purpose, including solicitation of customers, the information contained in the records of Fidelity, including, but not limited to, the names, addresses, and confidential financial information of any customer, individual or entity who Veve learned of through his employment with Fidelity; and

(c)     representing to any person, including but not limited to Fidelity customers whom Veve served or any customer, individual or entity whose name because known to Veve while in the employ of Fidelity, that he is employed by or affiliated with Fidelity in any way.

Additionally, Fidelity requests that the Court order:

(d)     Veve, and anyone acting in concert with him, including any agent, employee, officer or representative of Veve's new employer, to return to Fidelity any and all records, documents and/or information pertaining to Fidelity customers, whether in electronic, handwritten or any other form within five (5) days of entry of this order, including any and all copies.  This requirement includes all   records       or documents, in any form, created by Veve, or anyone acting in concert with him, based on documents or information that was received or removed from Fidelity by Veve.

(e)     Veve to file a declaration attesting that he has returned to Fidelity all information subject to this Court's Order within seven (7) days from the entry of this Court's Order; and

(f)     Fidelity and Veve, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3-4, to proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure.

Respectfully submitted this 30th day of July, 2012.

/s/ Christopher H. Toll
Christopher H. Toll
HOLLAND & HART LLP
6380 South Fiddlers Green Circle, Suite 500
Greenwood Village, CO 80111
Phone: (303) 290-1637
Fax: (303) 975-5300
Email: ctoll@hollandhart.com

P. Russell Perdew
Julie C. Webb
Ashlee M. Knuckey
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL  60606-4410
Phone:  (312) 443-0700
Fax: (312) 443-0336
Email: rperdew@lockelord.com
Email: jwebb@lockelord.com
Email: aknuckey@lockelord.com

**Attorneys for Plaintiff Fidelity Brokerage Services LLC**