IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:

FIDELITY BROKERAGE SERVICES LLC, a limited liability company,

      Plaintiff,

v.

ERIC VEVE, an individual,

      Defendant.

---

**FIDELITY'S MOTION FOR A TEMPORARY RESTRAINING ORDER
(WITHOUT SECURITY)**

---

# TABLE OF CONTENTS

STATEMENT OF FACTS ...................................................................................................2

    A.    Fidelity Creates And Maintains Its Customer Relationships. ...................................2

    B.    Fidelity Derives Significant Value From Its Trade Secret Customer Data. ...........4

    C.    Fidelity Takes Reasonable Steps To Preserve The Confidentiality Of Its
        Customer Data. .......................................................................................................5

    D.    Veve Agreed To Preserve The Confidentiality Of Fidelity's Trade Secret
        Customer Data By Executing Non-Disclosure And Non-Solicitation
        Agreements. ............................................................................................................6

    E.    Fidelity Assigns Veve A List Of 750 Customers To Service, And Provides Him
        With Trade Secret Confidential Information About Those Customers. .................7

    F.    In The Months And Days Prior To His Resignation, Veve Has An Extremely
        Low Client Contact Rate And Accesses A Client List That Was Mysteriously
        Removed Before Veve Departs. ..............................................................................7

    G.    Veve Was Reminded When He Resigned Of His Obligations Not To Solicit
        Fidelity Customers And To Preserve The Confidentiality Of Fidelity's Trade
        Secret Customer Data. ............................................................................................9

    H.    Veve Misappropriated Fidelity's Trade Secret Customer Data And Used It To
        Solicit Fidelity Customers......................................................................................10

    I.    Fidelity's Efforts To Stop Veve's Unlawful Conduct Without Court
        Intervention Have Failed.........................................................................................14

    J.    Fidelity Faces A Threat Of Immediate And Irreparable Harm From Veve's
        Conduct. ..................................................................................................................16

ARGUMENT ....................................................................................................................19

I.    Standards For Granting Temporary Injunctive Relief Strongly Favor Granting
    Fidelity Relief In This Case. ........................................................................................21

II.    Fidelity Is Likely to Succeed On The Merits Of Its Claims.............................................21

    A.    Veve Misappropriated Fidelity's Trade Secret Customer Information In
        Violation Of The Colorado Uniform Trade Secrets Act.......................................22

        1.    Fidelity's Customer Information Is A Trade Secret Under The CUTSA. .22

        2.      Veve Misappropriated Fidelity's Trade Secret Customer Information. ....25

    B.      Veve Is In Breach Of His Employee Agreements With Fidelity...........................27

    C.      Fidelity Will Prevail On Its Breach Of The Fiduciary Duty / Duty Of Loyalty Claim.............................................................................................................30

III.    Fidelity Has Suffered And Will Continue To Suffer Irreparable Harm If The Court Does Not Enjoin Veve's Wrongful Conduct. ...................................................31

IV.    The Balance Of Equities Tips Strongly In Favor Of Fidelity...........................................33

V.    The Public Interest Will Be Served By Granting Injunctive Relief...................................34

VI.    A Temporary Restraining Order Will Maintain The *Status Quo* Pending Arbitration......34

VII.    This Court May Enter Injunctive Relief Even Though The Merits Will Be Decided In Arbitration...................................................................................................35

VIII.    There Is No Need For A Bond. .........................................................................36

IX.    This Motion Complies With D.C. Colo. LCivR 7.1(A) And 65.1(A). ..............................37

CONCLUSION...................................................................................................37

# INDEX OF AUTHORITIES

CASES                                                                    PAGE(S)

*Big O Tires, Inc. v. Bigfoot 4X4, Inc.*,
    167 F. Supp. 2d 1216 (D. Colo. 2001)....................................................................21

*Blumenthal v. Merrill Lynch*,
    910 F.2d 1049 (2d Cir. 1990)............................................................................35

*Cereva Networks, Inc. v. Lieto*,
    No. 01-3835, 2001 WL 1228040 (Mass. Super. 2001)....................................27

*Combs v. PricewaterhouseCoopers*,
    382 F.3d 1196 (10th Cir. 2004) .........................................................................30

*Darwin Partners, Inc. v. Signature Consultants, LLC*,
    No. 00-0277, 2000 WL 33159238 (Mass. Super. 2000)...................................27

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
    269 F.3d 1149 (10th Cir. 2001) ..........................................................21, 32, 33, 34

*Doubleclick Inc. v. Paikin*,
    402 F. Supp. 2d 1251 (D. Colo. 2005)........................................................21, 32

*Fidelity Brokerage Serv. v. Alexopoulos*,
    No. 03-5362 (Mass. Super. Ct. 2003) .............................................................20, 27

*Fidelity Brokerage Serv. v. Donovan*,
    No. 03-2286 (Mass Super. Ct. 2003) ..............................................................20, 27

*Fidelity Brokerage Serv. v. Downey*,
    No. 08-1637 (E.D.N.Y. April 28, 2008) ...............................................................20

*Fidelity Brokerage Serv. LLC v. Fassenfeld*,
    No. 013945/11 (NY Sup. Ct. Sept. 28, 2011) ......................................................20

*Fidelity Brokerage Serv. LLC v. Franz*,
    No. 8/9564 (NY Sup. Ct. May 7, 2008).................................................................20

*Fidelity Brokerage Serv. v. Johnson*,
    No. A04-CA-662-SS (W.D. Tex. 2004) ...............................................................20

*Fidelity Brokerage Serv. v. Jones*,
    No. 04-3478 (S.D. Tex. 2004) ..............................................................................20

*Fidelity Brokerage Serv. LLC v. McNamara*,
No. 11-1092, 2011 WL 2117546 (S.D. Cal. May 27, 2011) ...................................20

*Fidelity Brokerage Serv. v. Parker*,
No. 04-1027-IEG(LSP) (S.D. Cal. 2004) .................................................20

*Fidelity Brokerage Serv. v. Rousseaux*,
No. 03-01319 (D. Md. 2003) .............................................................20

*Fidelity Brokerage Serv. v. Rupp*,
No. 05- 00083 (D.N.H. 2005) ...........................................................20

*Fidelity Brokerage Serv. LLC v. Sanchez*,
08-03863 (C.D. Cal. 2008) ............................................................20

*Fidelity Brokerage Serv. LLC v. Savell*,
12-01608 (E.D.Cal. June 19, 2012) ....................................................20

*Fidelity Brokerage Serv. v. Stockwell*,
No. 05-0455 (Mass. Super. Ct. 2005) ..................................................20

*Fidelity Brokerage Serv. v. Umstead*,
No. 07- 347 (E.D. Va. 2007) ...........................................................20

*Fidelity Brokerage Serv. v. Vance*,
No. 07-1230 (C.D. Cal. 2007) ..........................................................20

*Fidelity Brokerage Serv. LLC v. Wilder*,
No. 11-37296 (Mass. Super. Ct. Oct. 25, 2011) .....................................20, 27

*Fidelity Global Brokerage Group v. Beatty*,
No. 652147 (NY Sup. Ct. Dec. 6, 2010) ................................................20

*Fidelity Global Brokerage Group v. Gray*,
No. 10- 1255 (E.D. Va. Nov. 9, 2010) ..................................................20

*FMC Corp. v. Varco, Inc.*,
677 F.2d 500 (5th Cir. 1982) .........................................................22

*Fortune Personnel Consultants v. Hagopian*,
No. 97-2440, 1997 WL 796494 (Mass. Super. 1997).....................................27

*Gold Messenger, Inc. v. McGuay*,
937 P.2d 907 (Colo. App. 1997) ...............................................23, 26, 28

*Golder Assocs. v. Edge Envt'l, Inc.,*
No. 06-01260, 2007 WL 987458 (D. Colo. Mar. 30, 2007) ..................................................27

*Haggard v. Spine,*
No. 09-00721, 2009 WL 1655030 (D. Colo. June 12, 2009) ......................................... *passim*

*Harvey Barnett, Inc. v. Shilder,*
200 Fed. Appx. 734 (10th Cir. 2006) ...................................................................................30

*Hertz v. Luzenac Group,*
576 F.3d. 1103 (10th Cir. 2009) ..........................................................................................23

*I Can't Believe It's Yogurt v. Gunn,*
No. 94-2109, 1997 WL 599391 (D. Colo. Apr. 15, 1997).....................................................26

*IDS Fin. Servs., Inc. v. Smithson,*
843 F. Supp. 415 (N.D. Ill. 1994) ........................................................................................35

*Koontz v. Rosener,*
787 P.2d 192 (Colo. App. 1989) ..........................................................................................31

*Kroeger v. Stop & Shop Co., Inc.,*
432 N.E.2d 566 (Mass. Ct. App. 1982) ...............................................................................27

*Lundgrin v. Claytor,*
619 F.2d 61 (10th Cir. 1980) ...............................................................................................21

*In Re: Marriage of Fischer,*
834 P.2d 270 (Colo. App. 1992) ..........................................................................................28

*Merrill Lynch v. Bradley,*
756 F.2d 1048 (4th Cir. 1985) ......................................................................22, 29, 30, 35, 36

*Merrill Lynch v. Dutton,*
844 F.2d 726 (10th Cir. 1986) .................................................................................29, 30, 35

*Merrill Lynch v. Hegarty,*
808 F. Supp. 1555 (S.D. Fla. 1992), *aff'd,* 2 F.3d 405 (11th Cir. 1993)...........................29, 35

*Merrill Lynch v. Salvano,*
999 F.2d 211 (7th Cir. 1993) ...........................................................................21, 22, 29, 35

*Mgmt. Recruiters of Boulder, Inc. v. Miller,*
762 P.2d 763 (Colo. App. 1988) .............................................................................19, 28, 29

*Miller v. Kendall*,
  541 P.2d 126 (Colo. App. 1975) ................................................................28, 29, 32

*Network Communications, Inc. v. Boor-Crepeau*,
  790 P.2d 901 (Colo. App. 1990) ......................................................................23, 24

*Ortho Pharm. Corp. v. Amgen Inc.*,
  887 F.2d 460 (3d Cir. 1989) .....................................................................................35

*Otero Sav. and Loan Ass'n v. Fed. Reserve Bank of Kansas City, Mo.*,
  665 F.2d 275 (10th Cir. 1981) .................................................................................34

*Peabody Coalsales v. Tampa Electric*,
  36 F.3d 46 (8th Cir. 1994) .......................................................................................35

*Performance Unlimited v. Questar Pub.*,
  52 F.3d 1373 (6th Cir. 1995) ...................................................................................35

*PMS Dist. Co. v. Huber*,
  863 F.2d 639 (9th Cir. 1988) ...................................................................................35

*RGI, Inc. v. Tucker & Associates*,
  858 F.2d 227 (5th Cir. 1991) ...................................................................................29

*Roda Drilling Co. et al. v. Siegal et al.*,
  552 F.3d 1203 (10th Cir. 2009) ...............................................................................21

*Ruscitto v. Merrill Lynch*,
  777 F. Supp. 1349 (N.D. Tex. 1991), *aff'd*, 948 F.2d 1286 (5th Cir. 1991) (per
  curiam), *cert. denied*, 112 S. Ct. 1994 (1992)..................................................29, 35

*Saturn Sys., Inc. v. Militare*,
  252 P.3d 516 (Colo. App. 2011) ........................................................................27, 28

*Star Fuel Marts, LLC v. Sam's East, Inc.*,
  362 F.3d 639 (10th Cir. 2004) .............................................................................31, 32

*Stone Legal Res. Group, Inc. v. Glebus*,
  No. CA025136, 2003 WL 914994 (Mass. Super. 2003) .........................................27

*T.A. Pelsue Co. v. Grand Enter., Inc.*,
  782 F. Supp. 1476 (D. Colo. 1991).........................................................................31

*Teradyne Inc. v. Mostek Corp.*,
  797 F.2d 43 (1st Cir. 1986)......................................................................................35

*Turkey Creek LLC v. Rosiana*,
  953 P.2d 1306 (Colo. App. 1998) ......................................................................30

*Winnebago Tribe of Nebraska v. Stovall*,
  341 F.3d 1202 (10th Cir. 2002) ........................................................................36

*Winter v. Natural Res. Def. Council, Inc.*,
  129 S.Ct. 364 (2008) .........................................................................................36

*Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*,
  No. 07–02324, 2008 WL 2185882 (D. Colo. May 23, 2008) .......................... *passim*

## CONSTITUTION AND STATUTES

15 U.S.C. §§ 6801, *et. seq.* ..................................................................................5

15 U.S.C. § 6801(a) ..............................................................................................25

C.R.S. § 7–74–101, *et seq.* ....................................................................................1

C.R.S. § 7-74-102 ...........................................................................................23, 25

C.R.S. § 7-74-103 .........................................................................22, 25, 32, 34

C.R.S. § 8-2-113 .....................................................................................27, 28, 34

## OTHER AUTHORITIES

17 C.F.R. §§ 248.1, *et. seq.* ...................................................................................5

17 C.F.R. § 248.3 ..................................................................................................25

17 C.F.R. § 248.10 ................................................................................................25

FED. R. CIV. P. 65 ......................................................................................1, 21, 36

D.C. Colo. LCivR 7.1 ...........................................................................................37

D.C. Colo. LCivR 65.1 .....................................................................................1, 37

D.C. Colo. LCivR 67.1 .........................................................................................36

FINRA Rule 13804 ..........................................................................................18, 36

Pursuant to Federal Rule of Civil Procedure 65 and D.C. Colo. LCivR 65.1, Plaintiff Fidelity Brokerage Services LLC ("Fidelity"), by its undersigned counsel, hereby moves the Court for the entry of an immediate temporary restraining order ("TRO") (without security), in accordance with Fidelity's [Proposed] Order submitted concurrently herewith.  Fidelity seeks an immediate TRO against Defendant Eric Veve ("Veve") to stop his ongoing misappropriation of Fidelity's trade secrets, and to stop Veve from using that information to improperly solicit Fidelity customers in violation of the Colorado Uniform Trade Secrets Act, C.R.S. § 7–74–101, *et seq*. ("CUTSA"), and the Non-Solicitation and Non-Disclosure provisions of Veve's Employee Agreement with Fidelity.  Fidelity also seeks an immediate TRO to stop Veve from misrepresenting to Fidelity customers that he is still employed by Fidelity or otherwise affiliated with Fidelity, despite his departure to join one of Fidelity's competitors.

At the time of his resignation on Friday, July 6, 2012, Veve worked in Fidelity's retail brokerage operations as an Account Executive at Fidelity's Broomfield, Colorado branch office. (Declaration of Leslie Blickenstaff ("Blickenstaff Dec."), at ¶ 3; Declaration of Nick Powell ("Powell Dec."), at ¶ 4.)  Immediately after leaving Fidelity, Veve began his position as an investment advisor at Epiqwest Financial Corporation ("Epiqwest"), an independent Registered Investment Advisor ("RIA"), located in Lafayette, Colorado.  (Declaration of Maurice Stouse ("Stouse Dec."), at ¶ 13; Powel Dec. at ¶ 11.)  Epiqwest, as an RIA, provides services which are the same or highly similar to those offered by Fidelity, including, but not limited to, advising clients on investment matters and managing its clients' investment portfolios.  (Stouse Dec. at ¶ 13; Powel Dec. at ¶ 11.)  Fidelity competes with RIAs like Epiqwest for the advisory business of retail customers.  (Stouse Dec. at ¶ 13.)

Veve's misappropriation of Fidelity trade secret information and his use of that information to solicit Fidelity customers to transfer their accounts to Epiqwest – often while misrepresenting to customers that he is still associated with Fidelity – has caused irreparable harm and continues to cause irreparable harm.  Fidelity has repeatedly asked Veve to cease his illegal conduct, but Veve has refused to do so and has, instead, provided false information about the nature of his interactions with Fidelity customers to Epiqwest's President and its Operations Manager.  Without the requested injunctive relief, Veve will continue to profit from Veve's misappropriation and wrongful solicitation.  Colorado law requires the entry of an immediate TRO under these circumstances.

## STATEMENT OF FACTS

### A.    Fidelity Creates And Maintains Its Customer Relationships.

Fidelity and its affiliates provide a variety of financial services – such as retirement plan services, insurance services, and retail brokerage services – to Fidelity customers, with whom Fidelity typically enjoys significant, long term relationships.  (Powell Dec. at ¶ 3; Stouse Dec. at ¶ 3.)  Fidelity offers individual investors a broad assortment of trading and cash management features including buying and selling stocks, bonds, options and more than 5,100 mutual funds from Fidelity and other well-known fund companies.  (Powell Dec. at ¶ 3; Stouse Dec. at ¶ 3.)  In addition, Fidelity offers a wide array of financial services, including retirement services, investment planning, wealth management, securities execution and clearing, life insurance services and equity services.  (Powell Dec. at ¶ 3; Stouse Dec. at ¶ 4.)

Critically, Fidelity is unique in the retail brokerage field because Fidelity does not have its Account Executives make "cold calls" to persons who have no relationship with Fidelity, or

who were not referred to Fidelity.  (Stouse Dec. at ¶ 5.)  Instead, Fidelity requires its Account Executives to develop service relationships based upon leads that Fidelity provides.  (*Id*.) Fidelity provides leads to its Account Executives from two primary sources.

First, Fidelity forwards information to its representatives from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person.  (*Id*. at ¶ 6.) Fidelity and its affiliates devote tens of millions of dollars per year toward attracting customers to Fidelity's various businesses in a variety of means.  (*Id*.)  Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity; Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity; Fidelity maintains multiple call centers that prospective customers can use to initiate contact with Fidelity; and, Fidelity maintains prominent retail locations which prospective customers can visit.  (*Id*.)  A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity.  (*Id*.)

Second, Fidelity forwards information to its representatives regarding customers, with whom Fidelity already has a relationship, who either: (a) experience a "triggering event," such as maturity of a Fidelity 401(k) account, which may lead to interest in Fidelity's retail financial services; or (b) have at least $250,000 in assets with Fidelity but do not currently have a relationship with any particular Account Executive.  (*Id*. at ¶ 7.)  A significant portion of Fidelity's business is derived from servicing the needs of Fidelity's existing customers.  (*Id*.) Fidelity's lead-based approach to supporting its Account Executives distinguishes Fidelity from other full-service brokerages, where individual brokers, rather than the firm, are responsible for

establishing customer relationships. (*Id*.) Fidelity's success in its lead-based approach is based on the typically long-standing relationships it enjoys with its customers. (*Id*.)

**B.** **Fidelity Derives Significant Value From Its Trade Secret Customer Data.**

Fidelity's success with its unique lead-based approach to supporting Account Executives is directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets. (*Id*. at ¶ 9.) Fidelity's trade secret customer data includes the names of and contact information for Fidelity customers, and includes financial information relating to those customers, such as customer financial statements, investment goals, investment history, assets, income, and net worth. (*Id*.) Although certain information might be publicly available–such as an individual's name or published home telephone numbers–only a limited number of Fidelity employees know who among the general public are Fidelity customers, and therefore have a specific need for investment services. (*Id*.) Fidelity developed its customer data through a significant investment of time, labor, and capital, as described above. (*Id*.)

Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage in its customer base and to meet customer expectations that Fidelity will maintain sensitive, personally-identifiable information (including their identity as a customer, contact information and financial information) in confidence. (*Id*. at ¶ 10.) Fidelity derives substantial economic value from preserving its customer data as a trade secret. (*Id*.) Although individual customers are periodically subject to random solicitations from Fidelity competitors, no competitor can effectively target a set of Fidelity customers and address their needs without access to Fidelity's trade secret customer data. (*Id*.) In this way, maintaining the confidentiality

4

of Fidelity's trade secret customer data provides Fidelity with a significant competitive advantage over its competitors.  (*Id*.)

**C.    Fidelity Takes Reasonable Steps To Preserve The Confidentiality Of Its Customer Data.**

Fidelity vigilantly preserves its trade secret customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information.  (*Id*. at ¶ 11.)  Fidelity does not provide its trade secret customer data to competitors.  (*Id*.)  Fidelity maintains its trade-secret customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided such access.  (*Id*.)  Fidelity also maintains, and advises its employees of, a Confidentiality Policy that is displayed on Fidelity's intranet.  (*Id*.; Powell Dec. at ¶ 6 & Ex. 1.)  Fidelity periodically reminds its employees of this policy.  (Stouse Dec. at ¶ 11; Powell Dec. at ¶ 6.)  Fidelity also preserves trade secret customer data by requiring each employee to execute a standard Fidelity Employee Agreement.  (Stouse Dec. at ¶ 11; Powell Dec. at ¶ 6.)

Additionally, Fidelity has been vigilant in protecting its customers' privacy, because most Fidelity customers have not authorized Fidelity to share their contact or financial information outside of Fidelity.  Fidelity is required by federal law to prevent the disclosure to third parties of nonpublic customer information, including contact information and financial information.  *See* 15 U.S.C. §§ 6801, *et. seq.*; 17 C.F.R. §§ 248.1, *et. seq.*

**D.      Veve Agreed To Preserve The Confidentiality Of Fidelity's Trade Secret Customer Data By Executing Non-Disclosure And Non-Solicitation Agreements.**

One way that Fidelity preserves confidential and trade secret customer data is by requiring each employee to execute a standard Fidelity Employee Agreement.  (Powell Dec. at ¶ 7.)  On August 11, 2010, at the inception of his employment and as a condition of his employment, Veve signed an Employee Agreement.  (*Id*. at ¶ 7 & Ex. 2.)  Veve signed a second, nearly-identical Employee Agreement on November 30, 2010.  (*Id*. at ¶ 7 & Ex. 3.)

In the Employee Agreements, Veve acknowledged the confidentiality of Fidelity's data and records, including in particular Fidelity's customer lists and customer information.  (*Id*. at Exs. 2-3, § 1.)  Veve also promised to use Fidelity's Confidential Information only in the course of his employment with Fidelity and not to divulge Fidelity's Confidential Information to third parties.  (*Id*.)  Moreover, Veve agreed to refrain from soliciting Fidelity customers during, and for one year after the termination of, his employment with Fidelity.  (*Id*. at Exs. 2-3, § 6.)  Importantly, Veve further agreed that any violation of the Employee Agreement would cause Fidelity irreparable damage and would entitle Fidelity to seek emergency injunctive relief to protect its Confidential Information.  (*Id*. at Exs. 2-3, § 10.)

As consideration for the Employee Agreements, Fidelity hired and employed Veve, compensated him throughout his employment, and provided him with introductory and continuing on-the-job training.  (Stouse Dec. at ¶ 12; Powell Dec. as ¶ 8.)  Fidelity provided Veve with the above-described leads to enable Veve to succeed at Fidelity.  (Stouse Dec. at ¶ 12; Powell Dec. as ¶ 8.)  Fidelity further provided Veve with support services; paid for facilities, computer equipment, market reporting services, and all other business expenses; and registered

Veve with the Financial Industry Regulatory Authority ("FINRA"). (Stouse Dec. at ¶ 12; Powell Dec. as ¶ 8.) Fidelity provided Veve with sales assistance, research, the benefit of Fidelity advertising, goodwill and name recognition, access and use of experts in asset management, tax, estate planning and insurance, and with promotional marketing and sales support. (Stouse Dec. at ¶ 12; Powell Dec. as ¶ 8.)

### E. Fidelity Assigns Veve A List Of 750 Customers To Service, And Provides Him With Trade Secret Confidential Information About Those Customers.

As an Account Executive, Veve was assigned a list of existing Fidelity customers that he and an assigned customer service representative were required to service on behalf of Fidelity. (Stouse Dec. at ¶ 8; Powell Dec. as ¶ 5.) In order for Veve to service these customers, he required and was given access to their confidential personal and financial information. (Powell Dec. at ¶ 5.) At the time of his departure, Veve's assigned list was comprised of approximately 750 customer accounts (or approximately 460 households), representing approximately $250 *million* in assets under Fidelity management. (Stouse Dec. at ¶ 8; Powell Dec. as ¶ 5.) Veve was specifically provided contact and confidential financial information for each of these customers. (Stouse Dec. at ¶ 8; Powell Dec. as ¶ 5.)

### F. In The Months And Days Prior To His Resignation, Veve Has An Extremely Low Client Contact Rate And Accesses A Client List That Was Mysteriously Removed Before Veve Departs.

Fidelity keeps track of each Account Executive's client contact ratio, which is determined by what percentage of their book each representative has reached out to with a telephone call or an in-branch appointment within the last 120 days or four months. (Powell Dec. at ¶ 17.) In the four months before his departure from Fidelity, Veve contacted only thirty percent of the customers he was assigned to service. (*Id.*) This means that he did not contact seventy percent

of his customers in the 120 days before he left Fidelity. (*Id*.) Based on the reports of Fidelity customers, though, it appears that Veve began calling many of these customers within hours of his resignation on Friday, July 6, 2012. (*Id*.) But after his resignation, Veve was calling on behalf of Epiqwest, a Fidelity competitor. (*Id*.) And, even though he was calling on behalf of Epiqwest, Veve did not make it clear that he was no longer with Fidelity. (*Id*.) In fact, in many instances, Veve affirmatively misled customers to believe he was still with Fidelity. (*Id*.)

Fidelity has also uncovered information that indicates Veve accessed and then likely removed a spreadsheet containing customer personal and financial information just days before his resignation. As part of Fidelity's investigation into Veve's improper solicitation of Fidelity customers after his resignation, Fidelity's Technology Investigations Group collected and reviewed computer hard drive data for Veve's office desktop computer. (Powell Dec. at ¶ 18; Declaration of Bruce Rittenour ("Rittenour Dec."), ¶ 3.) Each time a document is opened or accessed, a .lnk or "link" file is automatically created (or updated) in the "Recent" folder. (Rittenour Dec. at ¶ 4.) A link file contains information such as the last date a file was accessed from the computer and the location of the file. (*Id*.) Links may point to files the user accessed over a network but never saved locally. (*Id*.) The link file acts as a shortcut, allowing the user to open the document more quickly the next time it is accessed. (*Id*.)

Through its investigation, Fidelity determined that on July 3, 2012 – three days before he resigned – Veve accessed a file named "Eric Book.xls" located in a folder called "Eric's Stuff" on a shared drive at Fidelity. (Powell Dec. at ¶ 18; Rittenour Dec. at ¶ 5.)[1] The file has since been removed, and Fidelity has not been able to recover any portion of the document. (Rittenour

---

[1] At Fidelity, a particular representative's list of assigned customers is commonly referred to as their "book." (Powell Dec. at ¶ 18; Reising Dec. at ¶ 2.)

Dec. at ¶ 5.)  Veve had access to the shared folder where this document was located, and it would not have been difficult for him to delete the file.  (*Id*. at ¶ 6.)

Fidelity has learned from Hillary Reising, who was Veve's assistant and worked on the same book as Veve for approximately 13 months prior to his resignation, that this spreadsheet likely contained confidential personal and financial information about each of the clients Veve was assigned to serve on behalf of Fidelity, including contact information, type of account, total assets and notes regarding which clients Veve spoke with about which particular products. (Powell Dec. at ¶ 18; Declaration of Hillary Reising ("Reising Dec."), at ¶ 3.)  In fact, last year, Veve asked Ms. Reising to input notes from her client interactions into this spreadsheet as well. (Reising Dec. at ¶ 3.)  Shortly before his resignation, Veve asked Ms. Reising if she used the spreadsheet.  (*Id*. at ¶ 4.)  Ms. Reising told Veve she had not used the spreadsheet for months because Fidelity records that type of information in its customer interaction software system. (*Id*.)  When the Technology Investigations Group and Ms. Reising went to look for the spreadsheet after Veve's resignation, it had been removed.  (Reising Dec. at ¶ 5; Rittenour Dec. at ¶ 5.)

G.    **Veve Was Reminded When He Resigned Of His Obligations Not To Solicit Fidelity Customers And To Preserve The Confidentiality Of Fidelity's Trade Secret Customer Data.**

Veve resigned from Fidelity on July 6, 2012 at 9:45 a.m, effective immediately.  (Powell Dec. at ¶ 9.)  Veve resigned in person, by handing in his resignation to his branch manager, C. Nick Powell.  (*Id*. at Ex. 4.)  When Veve handed in his resignation letter, Mr. Powell provided him with a copy of his Fidelity Employee Agreement and told him that Fidelity takes the protection of its confidential customer information very seriously.  (*Id*. at ¶ 9.)

On the date that Veve resigned, he was scheduled to have a meeting with Mr. Powell to discuss his performance during the first half of 2012.  (*Id*. at ¶ 10.)  Veve's activity and work performed on his book of business was significantly below his peers, and he was ranked last in his peer group.  (*Id*.)  The discussion was to center on ways to improve performance, however it was preempted by Veve's resignation.  (*Id*.)

H.     **Veve Misappropriated Fidelity's Trade Secret Customer Data And Used It To Solicit Fidelity Customers.**

In the first several days after Veve left Fidelity and joined Epiqwest, Fidelity received reports that Veve was calling and meeting with Fidelity customers.  (Powell Dec. at ¶ 11; Blickenstaff Dec. at ¶ 4.)  These customers reported that they received telephone calls from Veve soon after his resignation, including many on Saturday, July 7, 2012.  (Blickenstaff Dec. at ¶ 4.)

Fidelity requires, as part of its customer interaction policy, that representatives record qualifying customer interactions into a system called "Siebel," Fidelity's customer interaction software.  (Powell Dec. at fn.1.)  The records created in Siebel are made by the individual who interacted with the customer soon after the interaction occurs, as required by Fidelity, and are created, kept and maintained by Fidelity in the ordinary course of its business.  (*Id*.)  Accordingly, the Siebel notes tracked and maintained the reports Fidelity was receiving from its customers regarding Veve's solicitations of them.

Ms. Reising, a Fidelity Private Client Specialist who worked with the same customers as Veve, was involved in contacting many of the customers Veve served while he was at Fidelity to let them know he was no longer with the firm and that another representative would be assigned. (Reising Dec. ¶ 6).

Shockingly, several Fidelity customers contacted by Veve reported that Veve failed to mention he had left Fidelity and actively misled them into thinking was still associated with Fidelity but had merely switched roles or offices within Fidelity.  (Blickenstaff Dec. at ¶ 5; Powell at ¶ 12; Reising Dec. at ¶ 7.)  These Fidelity customers expressed that they felt very confused by Veve's conduct, and were upset to learn that he was working for a competitor rather than for another group within Fidelity, which is what he had represented when he called them after his resignation.  (Blickenstaff Dec. at ¶ 5; Reising Dec. at ¶ 7.)  Other Fidelity customers contacted by Veve reported that Veve told them he had left to join Epiqwest, extolled the purported benefits of transferring the management of their accounts away from Fidelity to Veve at Epiqwest, and sought to set up in-person appointments to continue his solicitation efforts.  (Powell Dec. at  ¶ 12; Blickenstaff Dec. at ¶ 6.)  Indeed, some Fidelity customers have recently reported that Veve first informed them of his intention to move to Epiqwest as early as June 15, 2012 – three weeks before his resignation.  (Powell Dec. at  ¶ 16; Blickenstaff Dec. at ¶ 7.)

Upon learning of these customer reports, Fidelity immediately became concerned that Veve was using Fidelity's confidential and trade secret customer information in an attempt to solicit Fidelity customers to transfer their business from Fidelity to Epiqwest, which directly competes with Fidelity in offering investment planning, wealth management and other financial services to customers.  (Blickenstaff Dec. at ¶ 9.)  Fidelity was also alarmed by Veve's misrepresentations that he continued to be associated with Fidelity, and his active deception of Fidelity customers.  (*Id*.)

This information was reported to Leslie Blickenstaff, in-house counsel for Fidelity, who reached out to Veve in an ongoing effort to resolve the issue, which will be explained in detail below. (*Id.* at ¶ 10; Powell at ¶ 13.)

Despite early efforts to remind Veve of his contractual obligation to maintain the confidentiality of Fidelity's trade secret customer information and refrain from soliciting Fidelity's customers, Fidelity has continued to receive the following reports that Veve is soliciting Fidelity customers to transfer the management of their accounts to Epiqwest and misleading Fidelity customers regarding his relationship to Fidelity (Powell Dec. at ¶ 15):

- G███ W█████ left a message for Fidelity Private Client Specialist Hillary Reising on July 9, 2012, stating that he was trying to get a hold of Veve. Mr. W█████ reported that Veve had called his home phone number on Friday, July 6th – the day that he resigned – "from the new group that he's working with" to make an appointment with Mr. W████ to discuss his accounts. Mr. W█████ was interested in changing the time of his appointment, and was stunned and confused when Ms. Reising informed him that Veve was no longer affiliated with Fidelity. Mr. W█████ reported that Veve did not tell him the name of the new group he was working with and made it sound like he was just changing groups within Fidelity. (Powell Dec. at ¶ 16; Reising Dec. at ¶ 8 & Ex. 1.)

- D████ L████ reported to Fidelity on July 9, 2012 that Veve had called him on Saturday, July 7th to tell Mr. L████ that he had switched firms and to discuss the new investment options he could provide at Epiqwest. (Powell Dec. at ¶ 16 & Ex. 5.)

- L███ A████ reported to Fidelity on July 10, 2012 that Veve had called her on Saturday, July 7th to tell her that he had left Fidelity. (Powell Dec. at ¶ 16 & Ex. 6.)

- K███ K████ reported to Fidelity on July 11, 2012 that Veve had already contacted her and that they were scheduled to meet that day to discuss her accounts. Later the same day, Ms. K████ informed Fidelity that she had decided to close her account so that

she could be "more versatile" with the money. (Powell Dec. at ¶ 16 & Ex. 7.)

- J███ "S███" A██████ reported to Fidelity on July 12, 2012 that Veve had contacted him and that he was scheduled to meet with Veve the same day to discuss account performance. (Powell Dec. at ¶ 16 & Ex. 8.)

- L██ B████ reported to Fidelity on July 12, 2012 that Veve had called him on July 11th and spoken to his wife. Veve told Mrs. B████ that he was now with a different group within Fidelity called "Fidelity Industrial" or something with a similar name. Mr. B████ also reported that Veve had called once before, about a week beforehand, but the B████ were not available at that time so Veve had followed up on July 11th. (Powell Dec. at ¶ 16; Reising Dec. at ¶ 8 & Ex. 4.)

- H███ and J██ H█████ reported to Fidelity on July 12, 2012 that Veve had actually told them on June 15th that he would be leaving the Broomfield branch office. They reported that Veve made it sound like he would be staying with Fidelity, but just transitioning to another group, and that Veve told them he would be in contact with them after the move. They were confused to learn that Veve had resigned from Fidelity, and was in fact working for a competitor. (Powell Dec. at ¶ 16; Reising Dec. at ¶ 8; *Id*. at Ex. 5.)

- H████ G████ reported to Fidelity on July 17, 2012 that Veve had called him "about a week ago around 7 p.m." Veve told Mr. G████ that he had transitioned to another group that was still affiliated with Fidelity, and that if Mr. G████ would just pay a little more money, Veve could get him better results. Mr. G████ also reported that Veve gave him a package to look through regarding the product he was recommending. Mr. G████ was confused and frustrated when he learned that Veve was no longer affiliated with Fidelity and was, in fact, working for a competitor. (Powell Dec. at ¶ 16; Reising Dec. at ¶ 8 & Ex. 6.)

- R█████ R████████ reported to Fidelity on July 18, 2012 that Veve had reached out to her and that she was meeting with him that afternoon. The next day, Ms. R███████ called Fidelity and indicated that she was closing her account and transferring the management of the portfolio over to Veve at Epiqwest. (Powell Dec. at ¶ 16 & Ex. 9.)

13

- On July 26, 2012, Fidelity Private Client Specialist Hillary Reising received a voicemail from J███ L███. Mr. L███ reported that Veve contacted him and asked him to transfer his assets to Veve. Mr. L███ declined to do so. (Powell Dec. at ¶ 16; Reising Dec. at ¶ 8 & Ex. 7.)

- C███ R████████ reported to Fidelity on July 30, 2012 that Veve contacted her late last week, set up an in-person appointment, and told her that his managed product would outperform Fidelity. (Powell Dec. at ¶ 16 & Ex. 10.)

The only way Veve could have had knowledge of these customers, their contact information and certain account details pertaining to them, is by using confidential and trade secret information that he misappropriated from Fidelity during his employment. (Blickenstaff Dec. at ¶ 8; Powell Dec. at ¶ 19.) Moreover, Veve is calling only a subset of the customers he serviced at Fidelity that have a particular type of managed account, known at Fidelity as Portfolio Advisory Services, and telling them he can obtain better results for them at Epiqwest. (Powell Dec. at ¶ 19.) It would be extremely hard to identify the particular customers with this type of account – which constitute only about 30% of his book – without a list. (*Id*.) The reports flowing in from Fidelity's customers, therefore, strongly suggested that Veve has in his possession and is using on behalf of his new employer, Epiqwest, Fidelity's confidential and trade secret customer information. (Blickenstaff Dec. at ¶ 8.)

## I. **Fidelity's Efforts To Stop Veve's Unlawful Conduct Without Court Intervention Have Failed.**

After receiving the first few customer reports detailed above, Fidelity sent a cease and desist letter letter to Veve on July 11, 2012. (Blickenstaff Dec. at 10 & Ex. 1.) In this letter, Fidelity indicated that it had reason to believe Veve was contacting and soliciting Fidelity customers, and Fidelity asked that he cease and desist from this conduct immediately. (*Id*.)

14

Fidelity also reminded him that, pursuant to his Employee Agreement, he was and is not permitted to use or disclose Fidelity customer information, including names, addresses, email addresses, telephone numbers, and account information (which would include portfolio worth, asset distribution, risk tolerance, and investment strategy and goals).  (*Id*.)  In addition, Fidelity formally requested that Veve return to Fidelity all such confidential and trade secret information in his possession.  (*Id*.)  Trent Culver, the President of Epiqwest, was copied in the letter.  (*Id*.) Veve did not return any information or respond to the cease and desist letter in any way.  (*Id*. at ¶ 11.)

Fidelity has an ongoing business relationship with Epiqwest.  (*Id*. at ¶ 13.)  In an effort to preserve this business relationship, Fidelity worked with the Fidelity Relationship Manager assigned to Epiqwest – Rebeca Perez – to ensure that Epiqwest was aware of Veve's improper conduct.  (*Id*.)  Ms. Perez contacted Mr. Culver soon after Fidelity sent the July 11, 2012 letter. (*Id*. at ¶ 14.)  She explained that Fidelity takes these situations very seriously and encouraged Mr. Culver to get Veve to stop soliciting Fidelity customers and misrepresenting that he was still employed by or affiliated with Fidelity.  (*Id*.)  Mr. Culver stated that he did not believe non-solicitation agreements were recognized in Colorado, but agreed to speak to Veve.  (*Id*.)

Fidelity continued to monitor this situation.  (*Id*. at ¶ 15.)  When Fidelity continued to receive reports of Veve soliciting and confusing customers about his relationship with Fidelity, Fidelity asked Ms. Perez to reach out to Mr. Culver for a second time.  (*Id*.)  Ms. Perez called Mr. Culver on July 18, 2012.  (*Id*.)  Mr. Culver told Ms. Perez that he had spoken with Veve and that Veve denied soliciting Fidelity customers or misleading customers into thinking he was still affiliated with Fidelity.  (*Id*.)  Ms. Perez encouraged Mr. Culver to speak with Veve again

because his report contradicted information Fidelity was receiving from its customers. (*Id.*) Mr. Culver said that he would speak to Veve again. (*Id.*) On July 25, 2012, Ms. Perez spoke to Todd Miller, Epiqwest's Operations Manager. (*Id.* at ¶ 16.) Mr. Miller told Ms. Perez that he had spoken with Veve and Veve denied soliciting Fidelity customers. (*Id.*)

Veve's statement that he is not soliciting Fidelity customers is at odds with the myriad reports Fidelity has received directly from the customers. Customers continue to report to Fidelity that they have been contacted by Veve, that Veve has solicited their business, and that Veve is intentionally misrepresenting that he is still affiliated with Fidelity despite his departure to join a competing firm. (*Id.* at ¶ 17.) Veve's refusal to acknowledge his wrongful conduct indicates that his unlawful behavior will not stop unless this Court enters the requested injunction.

J.      **Fidelity Faces A Threat Of Immediate And Irreparable Harm From Veve's Conduct.**

Since Veve resigned from Fidelity, at least three customers that Veve previously serviced on behalf of Fidelity have expressed their intention to transfer their accounts. (Powell Dec. at ¶ 20.) Two of these customers have confirmed that they intend to transfer their accounts to Veve at Epiqwest, while the other was evasive but called to initiate the transfer just hours after meeting with Veve. (*Id.*) Even as Fidelity prepares these papers, additional customers have told Fidelity that they intend to close their accounts and transfer to Veve at Epiqwest.

Veve's conduct has irreparably harmed Fidelity and will continue to irreparably harm Fidelity if not stopped immediately. (Stouse Dec. at ¶ 14; Powell Dec. at ¶¶ 21-22.) Indeed, Veve's conduct has and will continue to irreparably harm Fidelity's relationships with its customers by causing Fidelity to lose good will, future business and/or referrals. (Stouse Dec. at

16

¶ 14; Powell Dec. at ¶¶ 21-22.)  Customers may also lose trust and confidence in Fidelity's ability to secure inherently private information as a result of Veve's ongoing, wrongful conduct. (Stouse Dec. at ¶ 14; Powell Dec. at ¶ 21.)  This damage is incalculable as Fidelity cannot put a price on the value of its customer relationships and the damage caused when Veve took and improperly misused confidential customer information on behalf of a competitor.  (Powell Dec. at ¶ 21; Stouse Dec. at ¶ 14.)  Fidelity customers have an expectation that their confidential contact and financial information, such as their net worth, risk tolerances, investment goals, and preferences, will be protected.  (Stouse Dec. at ¶ 14; Powell Dec. at ¶ 21.)  Thus, customers understandably are concerned when former Fidelity employees, such as Veve, have access to their information and are using it to solicit their business at a new and different brokerage institution.  (Stouse Dec. at ¶ 14.)

Fidelity is also irreparably damaged by the actual and threatened loss of customer goodwill and the loss of assets caused by Veve's misrepresentations to Fidelity customers that he simply changed jobs within Fidelity rather than leaving for a competitor.  (Powell Dec. at ¶ 22.) Fidelity's relationships with its customers are incalculably harmed by false representations of affiliation, because it cannot control the content or quality of service provided by unaffiliated individuals.  (*Id*.)  This damage is also incalculable as Fidelity cannot put a price on the value of its customer relationships and goodwill.  (*Id*.)

In addition to the loss of customers' trust and good will, Fidelity faces direct financial loss insofar as certain customers, Fidelity have learned, have decided to transfer the management of their accounts to Veve at Epiqwest, and other customers are likely to do so in the future should Veve's solicitations and misrepresentations continue.  (Stouse Dec. at ¶ 15.)  The

financial impact of these losses – although undeniably significant – is especially difficult to calculate, as it cannot be determined with certainty what future investment opportunities are lost with each departing customer.  (*Id*.)

Faced with Veve's intentional misappropriation of Fidelity's confidential and trade secret customer information, Veve's misrepresentations to Fidelity customers regarding his affiliation (or lack thereof) with Fidelity, Veve's demonstrably false reports in response to Fidelity's attempts to work with Veve and Epiqwest to resolve these issues, and the resultant irreparable harm to Fidelity, Fidelity is left with no alternative but to seek immediate redress from this Court and FINRA.  (Blickenstaff Dec. at ¶ 19.)

Accordingly, concurrently with the filing of the Complaint and this Motion, Fidelity also is filing a Statement of Claim with FINRA seeking binding arbitration of this dispute pursuant to Rule 13804(a)(2).  (*Id*. at ¶ 20.)  Although the merits of this case will be resolved in arbitration before FINRA, Fidelity is ***required*** by FINRA Rule 13804 to seek and ***obtain*** immediate injunctive relief in a court of competent jurisdiction ***before*** an expedited FINRA arbitration is permitted to proceed.  (*Id*.)  Once the TRO is issued by this Court, an expedited arbitration will be scheduled with FINRA within fifteen (15) days of the entry of the TRO.  (*Id*.)  If no temporary restraining order is issued, however, Fidelity must obtain a preliminary injunction from the Court, as the case will not be heard by FINRA on an expedited basis and, instead, will be assigned to standard-track arbitration, a course of action that would delay a hearing on the merits for a year or more.  (*Id*.)  Immediate injunctive relief, therefore, is required to preserve the status quo until a hearing before FINRA can take place.  (*Id*.)

## ARGUMENT

Fidelity is entitled to an immediate TRO to protect Fidelity's trade secret and confidential customer information from Veve's unlawful misappropriation under Colorado law, as well as under the terms of Veve's Employee Agreement. Fidelity does not object to Veve's departure to work for a competitor, Epiqwest. As described above, however, Veve's actions go far beyond legitimate competition. Veve improperly and without regard to the rights of Fidelity and its customers used Fidelity's confidential and trade secret customer information that he stole from Fidelity to target, solicit and attempt to divert Fidelity customers to Epiqwest. Veve is also representing to Fidelity customers during these solicitations that he is still associated with or employed by Fidelity, despite his departure for a competing firm. The only way to prevent Veve from enjoying the fruits of his illegal behavior and from continuing to harm Fidelity and confuse its customers is through immediate injunctive relief. Thus, Fidelity seeks a narrowly tailored TRO, as detailed in the accompanying Proposed Order.

Colorado courts routinely grant injunctions barring employees from using their former employers' customer information to solicit the customers of their former employers. *See Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*, No. 07–02324, 2008 WL 2185882, *23 (D. Colo. May 23, 2008) (granting preliminary injunction based on defendant's misappropriation of trade secrets, breach of his employment agreement and breach of his fiduciary duty); *Haggard v. Spine*, No. 09-00721, 2009 WL 1655030, *14-16 (D. Colo. June 12, 2009) (granting preliminary injunction based on defendant's misappropriation of trade secrets and breach of his employment agreement); *Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 766 (Colo. App. 1988) (granting injunction based on defendant's breach of his employment agreement).

Fidelity vigorously seeks to protect its confidential and trade secret information.  Since 2003, Fidelity has sought and obtained injunctive relief to protect its confidential and trade secret information in numerous similar cases:  *Fidelity Brokerage Serv. LLC v. Savell*, No. 12-01608 (E.D. Cal. June 19, 2012); *Fidelity Brokerage Serv. LLC v. Wilder*, No. 11-37296 (Mass. Super. Ct. Oct. 25, 2011); *Fidelity Brokerage Serv. LLC v. Fassenfeld*, No. 013945/11 (NY Sup. Ct. Sept. 28, 2011); *Fidelity Brokerage Serv. LLC v. McNamara*, No. 11-1092, 2011 WL 2117546 (S.D. Cal. May 27, 2011); *Fidelity Global Brokerage Group v. Beatty*, No. 652147 (NY Sup. Ct. Dec. 6, 2010); *Fidelity Global Brokerage Group v. Gray*, No. 10- 1255 (E.D. Va. Nov. 9, 2010); *Fidelity Brokerage Serv. LLC v. Sanchez*, No. 08-03863 (C.D. Cal. 2008); *Fidelity Brokerage Serv. LLC v. Franz*, No. 8/9564 (NY Sup. Ct. May 7, 2008); *Fidelity Brokerage Serv. v. Downey*, No. 08-1637 (E.D.N.Y. April 28, 2008); *Fidelity Brokerage Serv. v. Umstead*, No. 07- 347 (E.D. Va. 2007); *Fidelity Brokerage Serv. v. Vance*, No. 07-1230 (C.D. Cal. 2007); *Fidelity Brokerage Serv. v. Stockwell*, No. 05-0455 (Mass. Super. Ct. 2005); *Fidelity Brokerage Serv. v. Rupp*, No. 05- 00083 (D.N.H. 2005); *Fidelity Brokerage Serv. v. Jones*, No. 04-3478 (S.D. Tex. 2004); *Fidelity Brokerage Serv. v. Parker*, No. 04-1027-IEG(LSP) (S.D. Cal. 2004); *Fidelity Brokerage Serv. v. Johnson*, No. A04-CA-662-SS (W.D. Tex. 2004); *Fidelity Brokerage Serv. v. Rousseaux*, No. 03-01319 (D. Md. 2003); *Fidelity Brokerage Serv. v. Donovan*, No. 03-2286 (Mass Super. Ct. 2003); and *Fidelity Brokerage Serv. v. Alexopoulos*, No. 03-5362 (Mass. Super. Ct. 2003). (*See* Appendix of Unpublished or Electronically-Published Fidelity Rulings filed concurrently herewith ("Appendix")).  In each instance, Fidelity successfully obtained a TRO to protect Fidelity's confidential and trade secret information and to stop ongoing solicitation of its customers.

# I. Standards For Granting Temporary Injunctive Relief Strongly Favor Granting Fidelity Relief In This Case.

Fidelity seeks immediate injunctive relief, pursuant to a fact pattern that courts have long respected for protecting retail brokerage services' trade secret customer information. A preliminary injunction is an equitable remedy available within the discretion of the trial court. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980). While it is an extraordinary remedy, an injunction should issue when the right to relief is clear and unequivocal. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001). However, "[t]he burden is on the movant to make a *prima facie* showing of a probable right to the ultimate relief and a probable danger of injury if the motion is denied." *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1221 (D. Colo. 2001).

Fidelity is entitled to immediate injunctive relief pursuant to Federal Rule of Civil Procedure 65, because Fidelity can demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Roda Drilling Co. et al. v. Siegal et al.*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 364, 374 (2008)); *see also Haggard*, 2009 WL 1655030 at *13 (citing *Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1254-55 (D. Colo. 2005)).

# II. Fidelity Is Likely to Succeed On The Merits Of Its Claims.

Over **150** courts have granted retail brokerage firms, such as Fidelity, the relief that Fidelity seeks here. *See e.g. Merrill Lynch v. Salvano*, 999 F.2d 211 (7th Cir. 1993); *see also* Appendix containing additional decisions, memorandum opinions, and orders which grant

injunctive relief to Fidelity in this very set of circumstances).  The Seventh Circuit in *Salvano* easily found injunctive relief appropriate for misappropriation of customer data:

> [T]he available evidence—indicating that Salvano and Coon took various documents and information pertaining to Merrill Lynch's client and used that information to solicit Merrill Lynch customers—sufficiently supports the Court's determinations regarding irreparable harm and the inadequacy of Merrill Lynch's legal remedy.

*Id.* at 215.

Likewise, in *Merrill Lynch v. Bradley*, the Fourth Circuit held that **immediate** injunctive relief, *i.e.*, "***within a few days,***" is necessary under these circumstances to avoid irreparable harm and to maintain *the status quo*.  756 F.2d 1048, 1054 (4th Cir. 1985) (emphasis added).  *See also FMC Corp. v. Varco, Inc.*, 677 F.2d 500, 504 (5th Cir. 1982) (emphasizing that absent immediate injunctive relief an employer's trade secrets "could be lost before a full trial on the merits could be held").

### A.  Veve Misappropriated Fidelity's Trade Secret Customer Information In Violation Of The Colorado Uniform Trade Secrets Act.

The Colorado Uniform Trade Secrets Act ("CUTSA") expressly provides for injunctive relief for either the actual or threatened misappropriation of trade secrets.  C.R.S. § 7–74–103.

#### 1.  Fidelity's Customer Information Is A Trade Secret Under The CUTSA.

Fidelity's customer data qualifies as a trade secret under CUTSA, because (as described above) the confidentiality of the data gives Fidelity a competitive advantage over competitors who do not have access to the data, and because Fidelity takes reasonable measures to preserve the data as a trade secret.

The CUTSA broadly defines "trade secret" as "the whole or any portion or phase of any . . . confidential business or financial information, listing of names, addresses, or telephone

numbers, or other information relating to any business or profession which is secret and of value. C.R.S. § 7-74-102(4). Significantly, the CUTSA expressly recognizes that lists of names can constitute a trade secret, so long as they are "secret and of value." *Id*.; *see also Hertz v. Luzenac Group*, 576 F.3d. 1103, 1114 (10th Cir. 2009) ("A customer list can be a trade secret when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available."); *Network Communications, Inc. v. Boor-Crepeau*, 790 P.2d 901, 902 (Colo. App. 1990) (reversing trial court ruling that customer list was not a trade secret).

Under Colorado law, when the terms of an agreement "declare that confidential information constitutes 'trade secrets'" of an employer, an employee is bound by this admission and "the confidentiality of this information will not be subject to contest." *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 911-12 (Colo. App. 1997) (citing *Kodekey Electronics, Inc. v. Mechanex Corp.*, 486 F.2d 449 (10th Cir. 1973) (applying Colorado law and finding agreement by defendants not to disclose information obtained, not to compete, and not to use information obtained detrimentally, was acknowledgment of fact that information was a trade secret)). Accordingly, since the Employee Agreements executed by Veve explicitly define customer lists as "Confidential Information" (*see* Powell Decl. ¶ 7 & Exs. 2-3), Veve is bound by such an admission.

Furthermore, Fidelity's information qualifies as trade secret under the factors that courts generally consider on this issue:

> 1) the extent to which the information is known outside the business; 2) the extent to which it is known to those inside the business, i.e., by the employees; 3) the precautions taken by the holder of the trade secret to guard the secrecy of the information;

23

4) the savings effected and the value to the holder in having the information as against competitors; 5) the amount of effort or money expended in obtaining and developing the information; and 6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Network Communications*, 790 P.2d at 903. Generally, reasonable efforts have been held to include "advising employees of the existence of a trade secret, limiting access to a trade secret on a 'need to know' basis, and controlling [ ] access." *Network Communications*, 790 P.2d at 902.

As explained in detail above, Fidelity goes to great lengths to ensure that its confidential and proprietary information remains confidential. Specifically, Fidelity's customer lists, customer contact information and customer financial information are entitled to trade secret protection because Fidelity takes reasonable if not painstaking steps to keep the information confidential. Fidelity's confidential customer information includes the names, addresses, telephone numbers, financial information, investment information and other confidential information about each Fidelity customer, all of which Fidelity uses in servicing its customers. (Stouse Dec. at ¶ 9.) To ensure that Fidelity's valuable customer information remains confidential, Fidelity (a) password-protects all computers containing customer information, (b) limits which employees have access to the passwords, (c) enforces a Confidentiality Policy limiting use and access to customer information, (d) reminds its employees periodically of the confidential and proprietary nature of its business information, (e) enters into non-disclosure agreements with employees, and (f) performs exit interviews on all departing employees during which it expressly reminds them of their confidentiality agreements with Fidelity. (*Id.* at ¶ 11.)

Fidelity has compiled its confidential customer information in the course of developing long-standing relationships with its customers, in which it has invested a large amount of time,

labor, and resources. (*Id*. at ¶ 9.) Clearly, access to this information gives Veve a significant competitive advantage. (*Id*. at ¶ 10.) Given that Fidelity has invested significant resources to develop this customer information, it would be extremely unfair to allow Veve to use the information as his own marketing list, without having made the same investment. Accordingly, Fidelity's confidential and proprietary information qualifies as a trade secret under CUTSA.[2]

2.     Veve Misappropriated Fidelity's Trade Secret Customer Information.

The CUTSA defines "misappropriation" as the acquisition, disclosure, or use of a trade secret of another, without express or implied consent, by a person who knows or has reason to know that the trade secret was acquired, disclosed, or used through improper means. *See* C.R.S. § 7-74-102(2). "Improper means" is defined as, *inter alia*, "misrepresentation [or] breach or inducement of a breach of a duty to maintain secrecy." *Id*. § 102(1). The CUTSA expressly provides that a court may enter temporary and permanent injunctive relief "to prevent or restrain ***actual or threatened misappropriation*** of a trade secret." C.R.S. § 7-74-103 (emphasis added).

As described above, Veve has already misappropriated Fidelity's trade secret customer information by using it to solicit several customers. And, there is also a clear threat of continuing misappropriation. First, Veve has denied having and has refused to return Fidelity's trade secret customer information. Second, even if Veve is using a customer list created from

_____

[2] Fidelity's customer information, including the identity of Fidelity customers, is also required to be kept confidential under the Gramm-Leach-Bliley Act and its implementing regulations. The statute declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a). The implementing regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent. 17 C.F.R. § 248.10. Nonpublic personal information is defined to include customer lists from financial institutions, *even if those lists contain only names of Fidelity customers* because the identity of an individual as being a customer of a particular financial institution is specifically protected by the federal regulations. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(2)(i)(D).

memory alone, such a situation still constitutes threatened misappropriation, for which the court may enter an injunction. *See Xantrex Tech.*, 2008 WL 2185882 at *19 (granting injunction where defendant had studied the plaintiff's product for several minutes and then, from memory, created "brain storming" documents for how to revise his new employer's product, "giv[ing] [the court] pause when considering a threatened disclosure of Xantrex's trade secrets").

Colorado courts have repeatedly granted injunctive relief to prohibit individuals from disclosing trade secrets belonging to their former employers. *See e.g.*, *I Can't Believe It's Yogurt v. Gunn*, No. 94-2109, 1997 WL 599391, *20 (D. Colo. Apr. 15, 1997); *Gold Messenger*, 937 P.2d at 911-12.

In sum, Fidelity is substantially likely to succeed on the merits of its misappropriation of trade secrets claim, pursuant to the CUTSA. Fidelity's confidential customer information is entitled to trade secret protection because Fidelity derives tremendous economic value from the fact that such information is not available to its competitors and goes to great lengths to keep the information secret. The value of Fidelity's customer information is perhaps best reflected, and underscored, by the fact that Veve immediately used the information to attempt to launch his career at Epiqwest and has continued using the information. To permit Veve unfettered access to this information would give him a significant, unfair advantage over Fidelity in that Veve and Epiqwest could utilize the information without having made the necessary investments in compiling the information. Thus, Fidelity has a reasonable likelihood of success on the merits of its trade secret claim against Veve.

**B.**     <u>Veve Is In Breach Of His Employee Agreements With Fidelity.</u>

In addition to violating the CUTSA, Veve's conduct breaches at least two provisions of

his Employment Agreement. That Agreement contained both non-solicitation and non-

disclosure clauses which prohibit Veve's continued use of Fidelity's trade secret customer

information for the benefit of a competitor. (Powell Dec. at Exs. 2-3, §§ 1, 6.) Veve's breaches

of his contractual obligations provide an independent basis for injunctive relief.

Under Colorado law,[3] restrictive covenants are enforceable when they are entered into

"for the protection of trade secrets." C.R.S. § 8-2-113(2)(b).[4] Colorado courts have adopted a

two-prong test to determine whether a non-solicitation clause fits within the trade secrets

exception of C.R.S. § 8–2–113(2)(b): "[1] The trial court must first examine the factual situation

to determine whether a restrictive covenant is justified at all . . . [2] The trial court must then

---

[3] The Employee Agreements contain a Massachusetts choice of law provision. (Powell Dec. at Exs. 2-3, § 10.) Fidelity would be entitled to an injunction on its contract claim under Massachusetts law just as it is under Colorado law. Massachusetts courts enforce non-solicitation and non-compete clauses if those agreements are reasonably necessary to protect the employer's legitimate business interests, including the protection of trade secrets. *Kroeger v. Stop & Shop Co., Inc.*, 432 N.E.2d 566, 570 (Mass. Ct. App. 1982); *Cereva Networks, Inc. v. Lieto*, No. 01-3835, 2001 WL 1228040, *5 (Mass. Super. 2001); *Stone Legal Res. Group, Inc. v. Glebus*, No. CA025136, 2003 WL 914994 (Mass. Super. 2003) (granting preliminary injunction for former employee's breach of non-solicitation, confidentiality, and non-compete clauses of employment agreement); *Darwin Partners, Inc. v. Signature Consultants, LLC*, No. 00-0277, 2000 WL 33159238, at *4 (Mass. Super. 2000) (granting TRO because non-solicitation provision was reasonable in time, space and scope, protected a legitimate business interest and did not violate any public interest or public policy); *Fortune Personnel Consultants v. Hagopian*, No. 97-2440, 1997 WL 796494, at *3 (Mass. Super. 1997) (granting preliminary injunction to enforce non-solicitation agreement). Moreover, Fidelity has successfully obtained a TRO and NASD (n/k/a FINRA) permanent injunctions in Massachusetts on each occasion it has sought such injunctions. *See* Appendix at *Fidelity v. Wilder,* No. Case No. 11-37296 (Mass. Super. Ct. Oct. 25, 2011); *Fidelity v. Alexopoulos,* No. 03-5362 BLS; *Fidelity v. Donovan*, No. 03-2286 BLS.

[4] For cases involving analysis of non-solicitation agreements (as opposed to non-competition agreements) under C.R.S. § 8-2-113, *see Haggard*, 2009 WL 1655030 at *10-11; *Golder Assocs. v. Edge Envt'l, Inc.*, No. 06-01260, 2007 WL 987458, *4 (D. Colo. Mar. 30, 2007); *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 526 (Colo. App. 2011) (citing *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 844 (Colo. App. 2007)).

examine the specific terms of the noncompetition clause to determine the reasonableness of their effect." *Saturn Sys.*, 252 P.3d at 526 (citing *Mgmt. Recruiters*, 762 P.2d at 766); *Haggard*, 2009 WL 1655030 at *5.

First, courts seek to determine the purpose of the agreement, analyzing the agreement as a whole. *Haggard*, 2009 WL 1655030 at *5; *Saturn Sys.*, 252 P.3d at 526-27. Both *Haggard* and *Saturn Systems* had restrictive covenants similar to the terms of Veve's Employee Agreement here, and in both cases, the courts found their purpose to be for the protection of trade secrets, falling with the exception stated in C.R.S. § 8–2–113(2)(b). *See Haggard*, 2009 WL 1655030 at *5 (finding that "the primary purpose behind the Non-Competition Covenant was the protection of information that Defendant considered to be trade secrets"); *Saturn Sys.*, 252 P.3d at 526-27 (finding the non-solicitation clause necessary to safeguard plaintiff's business).

Second, courts seek to determine whether the restricted covenants are reasonably limited in time and geographic scope. *Saturn Sys.*, 252 P.3d at 526 (citing *Gold Messenger*, 937 P.2d at 910-11; *Mgmt. Recruiters*, 762 P.2d at 766); *Xantrex*, 2008 WL 2185882 at *11; *Haggard*, 2009 WL 1655030 at *11. Veve's Employee Agreement meets each of these requirements.

The provisions in the Agreement sought to be enforced by Fidelity are narrowly tailored to protect Fidelity's trade secrets and are reasonable in duration and scope. The restriction lasts for a period of only 12 months following his termination, which is a reasonable length of time. *See Xantrex Tech.*, 2008 WL 2185882 at *11; *Mgmt. Recruiters*, 762 P.2d at 766 (one-year non-compete clause found reasonable); *Harrison v. Albright*, 577 P.2d 307 (1978) (five-year non-compete clause found reasonable); *In re: Marriage of Fischer*, 834 P.2d 270, 272-73 (Colo. App. 1992) (three year non-competition restriction found reasonable); *Miller v. Kendall*, 541 P.2d 126,

127 (Colo. App. 1975) (two year non-compete restriction after termination of employment found reasonable). Also, the non-solicitation covenant only restricts Veve from soliciting customers that Veve had access to and worked with by virtue of his employment with Fidelity. *See Mgmt. Recruiters*, 762 P.2d at 766 (limiting restriction to non-solicitation of customers defendant had previously dealt with while employed with plaintiff); *Haggard*, 2009 WL 1655030 at *11 (same). Additionally, "as to geographic scope, nation-wide restrictions have been held reasonable in geographic scope." *Xantrex Tech.*, 2008 WL 2185882 at *22, n.3.

Indeed, Courts routinely grant injunctive relief to uphold contractual confidentiality and non-solicit provisions for retail brokerage operations. *See e.g. Merrill Lynch v. Dutton*, 844 F.2d 726 (10th Cir. 1986); *Merrill Lynch v. Hegarty*, 808 F. Supp. 1555 (S.D. Fla. 1992), *aff'd*, 2 F.3d 405 (11th Cir. 1993); *Salvano*, 999 F.2d at 214; *Merrill Lynch v. Bradley*, 756 F.2d 1048 (4th Cir. 1985); *Ruscitto v. Merrill Lynch*, 777 F. Supp. 1349 (N.D. Tex. 1991), *aff'd*, 948 F.2d 1286 (5th Cir. 1991) (per curiam), *cert. denied*, 112 S. Ct. 1994 (1992).

Moreover, the Employee Agreement, by its terms, entitles Fidelity to immediate injunctive relief for breaches of the confidentiality and non-solicit provisions at issue. (Powell Dec. at Exs. 2-3, § 10.) This term is specifically enforceable as a substantive term of the parties' agreement to arbitrate. *See Fidelity v. Dutton*, 844 F.2d 726, 727-28 (10th Cir. 1988) ("first, plaintiff is entitled by the employment contract to entry of orders protecting the status quo . . ."); *RGI, Inc. v. Tucker & Associates*, 858 F.2d 227, 230 (5th Cir. 1991) (agreement to injunctive relief pending arbitration is a "bargained-for provision" which must be enforced to "insure that the arbitration clause of the contract will be carried out as written"). Fidelity only seeks to enjoin

Veve from soliciting Fidelity customers, a condition to which he specifically agreed.  *Dutton*,

844 F.2d 726; *Bradley*, 756 F.2d at 1054.

Veve was contractually obligated not to exploit Fidelity's confidential and trade secret

information and to refrain from soliciting Fidelity customers for one year.  He has breached both

of these obligations, and refused to stop his wrongful conduct despite multiple requests from

Fidelity.  Accordingly, Fidelity has a substantial likelihood of success on its breach of contract

claim.

 **C.**  **<u>Fidelity Will Prevail On Its Breach Of The Fiduciary Duty / Duty Of Loyalty</u>**
**<u>Claim.</u>**

Under Colorado law, "an employee normally owes fiduciary duties to his employer."

*Combs v. PricewaterhouseCoopers*, 382 F.3d 1196, 1200 n. 2 (10th Cir. 2004).  "A fiduciary

duty arises between parties through a relationship of trust, confidence and reliance."  *Turkey*

*Creek LLC v. Rosiana*, 953 P.2d 1306, 1312 (Colo. App. 1998).  The signing of a non-disclosure

and/or confidentiality agreement gives rise to these duties.  *See Harvey Barnett, Inc. v. Shilder*,

200 Fed. Appx. 734, 742-43 (10th Cir. 2006) (unpublished).  Here, Veve owed the fiduciary duty

of loyalty to Fidelity as an Account Executive and signatory to the Employee Agreement.

As an employee of Fidelity, Veve was one of the chosen employees given access to

Fidelity's confidential information and indisputably had a duty to exercise the utmost good faith

and loyalty with respect to Fidelity's trade secrets in the performance of his duties for Fidelity

and thereafter.  Veve callously breached that duty by taking Fidelity's Confidential Information

to Epiqwest and using it unlawfully to solicit Fidelity's customers and mislead Fidelity's

customers into thinking he was still affiliated with Fidelity.  Three days before he resigned and

*while he was still an employee of Fidelity*, Veve accessed a document called "Eric Book.xls,"

which contained, among other information, client names, account identifying information and notes regarding which clients Veve spoke with about which products – the very information Veve later used to unlawfully solicit Fidelity's customers. (Rittenour Dec. at ¶ 5; Reising Dec. at ¶¶ 3-4.) Moreover, on June 15, 2012, *three weeks before his resignation*, Veve told Mr. and Mrs. H█████ that he would be leaving the Broomfield branch office, making it sound like he would still be employed by Fidelity but working in a different group. (Powell Dec. at ¶ 16; Reising Dec. at ¶ 8; *Id*. at Ex. 5.) At that time, Veve had not yet told Fidelity of his intention to leave for a competitor. There can be no dispute that this is a breach of the duty of loyalty that Veve owed to Fidelity. *See Koontz v. Rosener*, 787 P.2d 192, 195-96 (Colo. App. 1989) (by working to set up competing business while still engaged by employer, employees violated their duty of loyalty); *see also T.A. Pelsue Co. v. Grand Enter., Inc*., 782 F. Supp. 1476, 1485-86 (D. Colo. 1991) (even solicitation that occurs after termination of the employment relationship may amount to a breach of a fiduciary duty or a duty of loyalty). Thus, Fidelity has been and will continue to be irreparably damaged by Veve's multiple and continuing breaches of his fiduciary duty of loyalty.

III. **Fidelity Has Suffered And Will Continue To Suffer Irreparable Harm If The Court Does Not Enjoin Veve's Wrongful Conduct.**

Despite the fact that Fidelity need not show irreparable harm under these circumstances, it is unequivocal that Fidelity has suffered and will continue to suffer irreparable harm as a result of Veve's unlawful acts.

First, "'[w]hen the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown.'" *Star Fuel Marts,*

*LLC v. Sam's East, Inc.*, 362 F.3d 639, 651-52 (10th Cir. 2004) (citing *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001)).  Here, Fidelity has brought a claim for injunctive relief pursuant to the CUTSA and to enforce its non-compete and non-solicitation provisions with Veve, which prohibit his use and disclosure of Fidelity's trade secret customer information.  The CUTSA specifically provides for injunctive relief, stating that: "[t]emporary and final injunctions including affirmative acts may be granted on such equitable terms as the court deems reasonable to prevent or restrain actual or threatened misappropriation of a trade secret."  C.R.S. § 7-74-103. Accordingly, Fidelity is not required to satisfy the "irreparable harm" element in making this claim for a preliminary injunction.

Second, despite the discharge of this obligation, Fidelity can clearly establish that it will suffer immediate and irreparable harm unless Veve is enjoined from further misappropriating Fidelity's trade secrets and further breaches of his Employee Agreement.  Irreparable injury is established "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain."  *Dominion Video*, 269 F.3d at 1156.  "In other words, if money damages would not compensate the movant, the damage is irreparable."  *Haggard*, 2009 WL 1655030 at *14.

"Indeed, the difficulty of providing damages in non-competition clause cases has made injunctive relief the preferred remedy in Colorado."  *Doubleclick*, 402 F. Supp. 2d at 1260; *see also Haggard*, 2009 WL 1655030 at *14 ("[i]njunctive relief is especially appropriate in non-competition cases because of the difficulty in proving money damages caused by illicit competition."); *Miller*, 541 P.2d at 127 ("Where there is a noncompetition agreement, breach is the controlling factor and injunctive relief follows almost as a matter of course.  Damage is

presumed to be irreparable and the remedy at law is considered inadequate.").  The

misappropriation and threatened continuing misappropriation of its trade secrets, as well as

Veve's breach of his Employee Agreement and duty of loyalty, constitute irreparable harm to

Fidelity, because the damages to Fidelity are incalculable.

Moreover, loss of customers, loss of good will and threats to a business' viability

constitute irreparable harm.  *Dominion Video*, 356 F.3d at 1156.  Fidelity is also especially

vulnerable to irreparable harm through loss of customer goodwill here, where Veve is misleading

customers into thinking he is still affiliated with Fidelity.  Additionally, Veve's theft and use of

Fidelity's customer information for the benefit of his new employer, Epiqwest, threatens to cause

Fidelity customers to think that Fidelity does not protect the security of their confidential

financial information.

In short, Fidelity has been and will continue to be irreparably harmed by Veve's unlawful

conduct, if this Court does not grant Fidelity the emergency injunctive relief requested.

**IV.**     **The Balance Of Equities Tips Strongly In Favor Of Fidelity.**

The benefit of injunctive relief to Fidelity far outweighs any detriment to Veve.  "This

factor is simply a comparison between the injury Defendant would suffer should no preliminary

injunction enter, *e.g.*, loss of goodwill, competitive disadvantage, etc., versus the injury Plaintiff

would suffer if the preliminary injunction does enter, *e.g.*, loss of livelihood in chosen field."

*Haggard*, 2009 WL 1655030 at *15.  Here, if Veve were allowed to continue using Fidelity's

trade secrets and violating the restrictive covenants in his Employee Agreement, Fidelity's injury

would be both permanent and irreparable, whereas an injunction would protect Fidelity's

valuable trade secrets, goodwill, business reputation, methods of business operation, and contract

rights.  In contrast, any "detriment" to Veve would be temporary, *i.e.*, limited to the one-year

period he agreed to in his Employee Agreement, and limited in scope to customers with whom

he came into contact with during his employment at Fidelity.  Thus, this factor also weighs in

favor of granting Fidelity the emergency injunctive relief sought.

**V.      The Public Interest Will Be Served By Granting Injunctive Relief.**

Colorado law protects the improper and illegal diversion of trade secrets.  It has enacted

the CUTSA specifically in order to prevent and/or provide remedies to victims of

misappropriation of trade secrets.  C.R.S. § 7-74-103.  Moreover, protection of trade secrets is an

explicit "exception to the statutory bar in C.R.S. § 8-3-112(2)."  *Haggard*, 2009 WL 1655030 at

*16.  Therefore, it is unquestionably consistent with Colorado public policy to protect the

disclosure of Fidelity's confidential and trade secret customer information by granting Fidelity's

Motion.  *Xantrex*, 2008 WL 2185882 at *16 ("the public interest favors entry of an injunction

because the public never benefits from trade secret misappropriation.").

**VI.     A Temporary Restraining Order Will Maintain The *Status Quo* Pending
         Arbitration.**

An emergency injunction is appropriate to preserve the *status quo* that existed as of the

last peaceable act – immediately prior to the misappropriation of Fidelity's trade secrets, and

Veve's breach of his Employee Agreement.  *See Otero Sav. and Loan Ass'n v. Fed. Reserve

Bank of Kansas City, Mo.,* 665 F.2d 275 (10th Cir. 1981); *Dominion Video*, 269 F.3d at 1155

("[T]he status quo is the last uncontested status between the parties which proceed the

controversy until the outcome of the final hearing.") (citations omitted).  To preserve the *status

quo*, an injunction should require Veve to return all Fidelity data, to refrain from further

solicitation of Fidelity customers, and to refrain from misrepresenting to Fidelity customers that

he is still affiliated with Fidelity. *See IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415 (N.D.

Ill. 1994) (granting preliminary injunction against defendant former employee, based, in part, on

the court's determination that "[plaintiff's] clients, innocent third parties, will be protected by the

maintenance of the status quo," because it will prevent defendant from "blatantly mislead[ing]

the clients he has been serving into believing that they are still somehow being served by

[plaintiff] notwithstanding [defendant's] new affiliation with [a competitor].").

**VII.    This Court May Enter Injunctive Relief Even Though The Merits Will Be Decided In Arbitration.**

Fidelity is entitled to injunctive relief from this Court pending FINRA arbitration. The

United States Circuit Courts of Appeal for the First through the Eleventh Circuits all have held

that securities firms are entitled to immediate injunctive relief pending the outcome in arbitration

to preserve the *status quo. See Salvano*, 999 F.2d at 214; *Teradyne Inc. v. Mostek Corp.*, 797

F.2d 43 (1st Cir. 1986); *Blumenthal v. Merrill Lynch*, 910 F.2d 1049 (2d Cir. 1990); *Ortho*

*Pharm. Corp. v. Amgen Inc.*, 887 F.2d 460 (3d Cir. 1989); *Bradley*, 756 F.2d at 1053-54;

*Ruscitto*, 777 F. Supp. 1349; *Performance Unlimited v. Questar Pub.*, 52 F.3d 1373 (6th Cir.

1995); *Peabody Coalsales v. Tampa Electric*, 36 F.3d 46 (8th Cir. 1994); *PMS Dist. Co. v.*

*Huber*, 863 F.2d 639 (9th Cir. 1988); *Merrill Lynch v. Dutton*, 844 F.2d 726 (10th Cir. 1988);

*Merrill Lynch v. Hegarty*, 808 F. Supp 1555, 1561 (S.D. Fla. 1992), *aff'd*, 2 F.3d 405 (11th Cir.

1993) (per curiam).

In *Bradley*, the Fourth Circuit expressly held:

> The arbitration process would be a ***hollow formality*** where the
> arbitral award when rendered could not return the parties to the
> status quo ante.... When an account executive breaches his
> employment contract by soliciting his former employer's
> customers, ***a non-solicitation clause requires immediate***
> ***application to have any effect. An injunction even a few days***

> *after solicitation has begun is unsatisfactory* because the damage
> is done. ***The customers cannot be "unsolicited."*** It may be
> impossible for the arbitration award to return the parties to the
> status quo ante because the prevailing parties' damages may be too
> speculative.

756 F.2d at 1053-1054 (emphasis added).

In fact, under FINRA Rule 13804, Fidelity is *required* to seek and obtain immediate injunctive relief in a court of competent jurisdiction before an expedited FINRA arbitration is permitted to proceed. Thus, Fidelity's election to seek immediate injunctive relief from both the FINRA and this Court is not only consistent, but is required under the FINRA Code of Arbitration Procedure.

## VIII.   <u>There Is No Need For A Bond.</u>

Although a bond is required under Federal Rule of Civil Procedure 65(c) and Local Civil Rule 67.1, the district court has wide discretion as to the amount, and a bond is not necessary absent proof of a likelihood of harm to a defendant. *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2002); *Xantrex*, 2008 WL 2185882 at 22 ("Because I find that Defendants will not suffer any harm as the result of the injunction, there is no need for a bond.").

Here, Fidelity has demonstrated an overwhelming likelihood of success on its claims and has made a clear showing of ongoing and irreparable harm. The requested injunctive relief will not impede or prevent Veve from conducting business. Rather, the requested injunctive relief will narrowly enjoin Veve from continuing to unlawfully solicit Fidelity's customers, from continuing to mislead Fidelity's customers as to his affiliation and/or employment with Fidelity, and from unlawfully retaining and using Fidelity's confidential and trade secret customer information. Accordingly, Fidelity respectfully requests that the Court either dispense with the bond requirement or require a nominal bond.

## IX. This Motion Complies With D.C. Colo. LCivR 7.1(A) And 65.1(A).

Prior to filing this Motion, Fidelity repeatedly reached out to Veve and his new employer, Epiqwest, to seek Veve's commitment to stop the unlawful behavior detailed herein. Veve not only refused to do so, but denied engaging in any wrongful conduct whatsoever. Pursuant to D.C. COLO. LCivR 7.1, concurrent with the e-filing of this case, counsel for Fidelity hand-delivered copies of the Complaint, Fidelity's Motion for a Temporary Restraining Order (Without Security), and all other documents filed therewith, to counsel for Veve. Given the nature of the relief sought and the parties' previous discussions on this subject, Fidelity understands that counsel for Veve opposes Fidelity's Motion.

Pursuant to D.C. Colo. LCivR 65.1, counsel for Fidelity certifies that actual notice of the time of filing this Motion, and copies of all pleadings and papers filed in this action to date or to be presented to the Court at the hearing on this Motion, are being furnished to counsel for Veve concurrently with the e-filing of this Motion.

## CONCLUSION

For all of the foregoing reasons, Fidelity respectfully requests that the Court grant Fidelity's Motion For A Temporary Restraining Order (Without Security) and issue the requested injunctive relief in accordance with Fidelity's [Proposed] Order submitted concurrently herewith.

Respectfully submitted this 30th day of July, 2012.

/s/ Christopher H. Toll
Christopher H. Toll
HOLLAND & HART LLP

6380 South Fiddlers Green Circle, Suite 500
Greenwood Village, CO 80111
Phone: (303) 290-1637
Fax: (303) 975-5300
Email: ctoll@hollandhart.com

P. Russell Perdew
Julie C. Webb
Ashlee M. Knuckey
LOCKE LORD LLP
111 South Wacker Drive
Chicago, IL  60606-4410
Phone:  (312) 443-0700
Fax: (312) 443-0336
Email: rperdew@lockelord.com
Email: jwebb@lockelord.com
Email: aknuckey@lockelord.com

**Attorneys for Plaintiff Fidelity Brokerage Services LLC**